# No. 23-10848-B

IN THE UNITED STATES COURT OF
APPEALS FOR THE ELEVENTH CIRCUIT


United States of America,

*Appellee*,

v.

Eduardo Ulises Martinez,

*Appellant*.


ON APPEAL FROM THE UNITED STATES DISTRICT
COURT FOR THE SOUTHERN DISTRICT OF FLORIDA,
No. 22-cr-20137-JEM-1
DEFENDANT INCARCERATED


**BRIEF OF THE APPELLANT
EDUARDO ULISES MARTINEZ**

Neil M. Schuster
Joseph M. Schuster
Counsels for Appellant
555 NE 15th Street,
Suite 2C
Miami, FL 33132
Telephone: 305-416-0324
Facsimile: 305-416-0325
Email: neil@neilmschuster.com
        joe@josephmschuster.com

***United States v. Eduardo Ulises Martinez***, Case No. 23-10848-B
**Certificate of Interested Persons**

Pursuant to 11th Cir. R. 26.1-2(c), Appellant certifies that the below listed persons and entities have interests in the outcome of this case:

Becerra, Hon. Jacqueline, United States Magistrate Court Judge

Brabender, Allen M., Attorney, United States Department of Justice

Elfenbein, Marty Fulgueira, Assistant United States Attorney

Fernandez, Luis

Friedman, Lindsey Lazopoulos, Assistant United States Attorney

Gonzalez, Juan Antonio

Kim, Todd, Assistant Attorney General

Lapointe, Markenzy, United States Attorney

Lundman, Robert, Attorney, United States Department of Justice

Martinez, Eduardo Ulises, Appellant

Martinez, Hon. Jose E. Martinez, United States District Court Judge

Matzkin, Daniel, Assistant United States Attorney

McAliley, Hon. Chris M., United States Magistrate Court Judge

Paster, Joshua, Assistant United States Attorney

Pelier, Robert Nelson

Rubio, Lisa Tobin, Chief, Appellate Division

Schuster, Joseph, Counsel for Appellant

Schuster, Neil M., Counsel for Appellant

Stockman, Robert P., Attorney, United States Department of Justice

Torres, Hon. Edwin G., United States Magistrate Court Judge

## Corporate Disclosure Statement

Counsel certifies there is no nongovernmental corporate party to this proceeding, and no association of persons, firms, partnerships, or corporations that have an interest in this case or the outcome of the appeal and counsel have completed the Web-Based CIP attesting the same.

# STATEMENT REGARDING ORAL ARGUMENT

The Defendant respectfully submits that oral argument is necessary to the just resolution of this appeal and will significantly enhance the decision-making process, particularly in relation to the Sixth Amendment fair trial issue which is fact dependent, (1) focuses on the Defendant's custodial statements, (2) the Rule of Completeness, and (3) what the trial court allowed the prosecution to cherry-pick from the Defendant's airport interrogation for jury presentation.

Given the trial judge's prejudicial choice of what evidence to admit and eliminate before the jury, oral argument will provide an opportunity to focus on the nuance of what was really said and admitted, compared to what was excluded. That analysis at oral argument is important in light of a complicated regulatory scheme governing the sale, import and export of antique statuettes containing discernable amounts of ivory.

This appeal also raises a question of the sufficiency of evidence to support conviction for obstruction of justice as well as a question of first impression concerning valuation of antiques at sentencing which suggests that oral argument would promote a fair and just resolution of this case.

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS ........................................................ ii

STATEMENT REGARDING ORAL ARGUMENT ............................................iv

TABLE OF CITATIONS ..............................................................................v

STATEMENT OF JURISDICTION...................................................................... xiii

STATEMENT OF THE ISSUES...........................................................................1

STATEMENT OF THE CASE...............................................................................2

    Course of Proceedings and Disposition in the District Court .........................2

    Statement of the Facts........................................................................................2

        A.  Pretrial and trial orders limit the defense and defense dismissal motions are denied..................................................................................2

        B.  Jury instructions required proof of guilty knowledge, but the court's evidentiary rulings precluded "knowledge" and "specific intent" related defense evidence....................................................................4

        C.  The government's opening statement highlights the element of specific intent though the *in limine* orders preclude introduction of relevant defense evidence such as, (1) a confusing group of ESA governing regulations, (2) cross examination about those confusing regulations, and (3) Martinez's full interview statements explaining his lack of specific intent and (mis)understanding of regulations. .........................5

        D.  The court excluded many of Martinez's Interview statements such that the portions prejudicially admitted presented a false and incomplete portrayal of Martinez's true words and intent........................................7

        E.  The government's Import/Export case................................................13

F.  Closing Argument. ............................................................................20

G.  The government's Obstruction of Justice case:  Count 13.................21

H. Sentencing. .....................................................................................22

Standards of Review ...........................................................................24

SUMMARY OF THE ARGUMENT ....................................................26

ARGUMENTS AND CITATIONS OF AUTHORITY ..........................29

I.    Whether the District Court, (1) Violated Martinez's Sixth
      Amendment Right to a Fair Trial or (2) Misapplied Binding
      Precedent Under The Rule of Completeness (FRE 106) by
      Cherry-Picking Excerpts from the Defendant's Airport Interview
      While Categorically Prohibiting Cross-Examination on the
      Relevant Balance of Contemporeneous Statements Explaining
      Why the Defendant Believed He Did Not Violate The Law ..............29

II.   Whether the District Court Erred by Precluding the Defense
      From Presenting Any Evidence, Witness Examination, or
      Argument About The Antique And *De Minimis* Exceptions to
      The Endangered Species Act Given That, (1) Those Exceptions
      Directly Impacted Martinez's Understanding of His Legal
      Obligations and (2) Evidenced Why He Lacked the Requisite
      *Mens Rea* to Violate the Import/Export Crimes Charged .................37

III.  Whether the Government's Claim During Closing Argument that
      the Defendant Lost the Presumption of Evidence was Plain Error
      ........................................................................................................49

IV.   Whether the Trial Court Erred by Failing to Grant the
      Defendant's Rule 29 Motion to Dismiss Count 14, Charging
      Obstruction of Justice.........................................................................50

V.    Whether the Trial Court Erred in Calculating the Defendant's
      Sentencing Guideline Range................................................................ 52

vi

CONCLUSION ......................................................................................58

CERTIFICATE OF COMPLIANCE ......................................................59

CERTIFICATE OF SERVICE .............................................................59

ADDENDUM 1:  Text of the "Antique Exception," 50 C.F.R. § 14.22

ADDENDUM 2:  Text of the "De Minimis Exception," 50 C.F.R. § 17.40(e)(3)

ADDENDUM 3:  Director's Order 210, Appendix 1, Guidance on the Antique
                Exception under the Endangered Species Act (ESA)

ADDENDUM 4:   List of Key Redacted Statements from the Interview

## Cases

*Holmes v. South Carolina,*
547 U.S. 319, 324 (2006) ........................................................ 31, 42

*Beech Aircraft Corp. v. Rainey,*
488 U.S. 153, 171 (1988) ..............................................................31

*Butler v. S. Pac. Co.,*
431 F.2d 77, 79 (5th Cir. 1970) ...................................................43

*Carver v. United States,*
164 U.S. 694 (1897) ......................................................................31

*Chambers v. Mississippi,*
410 U.S. 284 (1973) ......................................................................31

*Chapman v. California,*
386 U.S. 18, 22 (1967) ..................................................................25

*Chrysler Corp. v. Brown,*
441 U.S. 281, 295–96 (1979) ........................................................45

*Crane v. Kentucky,*
476 U.S. 683 (1986) ......................................................................31

*Hall v. United States,*
419 F.2d 582, 587 (5th Cir. 1969) ................................................49

*Kotteakos v. United States,*
328 U.S. 750, 776 (1946) ..............................................................25

*Pierrot v. United States,*
471 U.S. 1104 (1985) ....................................................................55

*United States v. Alghazouli,*
517 F.3d 1179, 1180, 1187 (9th Cir. 2008) ..................................45

*United States v. Bailey,*
Case No. PWG-16-0246, 2017 WL 5126163, *9-11 (D. Md. Nov. 6, 2017) ......36

*United States v. Baker*,
432 F.3d 1189, 1202 (11th Cir. 2005) ........................................................ 24, 32

*United States v. Barfield*,
999 F.2 1520, 1522 (11th Cir. 1993) ..............................................................25

*United States v. Brand*,
775 F.2d 1460, 1469 (11th Cir. 1985) (citation omitted) ............................. 50, 51

*United States v. Diaz*,
26 F.3d 1533, 1539 (11th Cir. 1994) ..............................................................24

*United States v. Finestone*,
816 F.2d 583, 585 (11th Cir. 1987) ................................................................ 43

*United States v. Gravely*,
840 F.2d 1156, 1163 (4th Cir. 1988) ..............................................................36

*United States v. Green*,
694 F. Supp. 107, 110 (E.D. Pa. 1988) ...........................................................37

*United States v. Green*,
No. CR415-204-3, 2016 WL 8738040 (S.D. Ga. May 20, 2016) ......................33

*United States v. Ignasiak*,
667 F.3d 1217, 1227 (11th Cir. 2012) .............................................................25

*United States v. Izurieta*,
710 F.3d 1176, 1179–80 (11th Cir. 2013) ........................................................45

*United States v. Kelly*,
888 F.2d 732, 743 (11th Cir. 1989) ................................................................43

*United States v. Ladson*,
643 F.3d 1335, 1341 (11th Cir. 2011) .............................................................24

*United States v. Lankford*,
955 F.2d 1545, 1548 (11th Cir.1992) ..............................................................24

*United States v. LeFevour*,
798 F.2d 977, 980–82 (7th Cir. 1986) .............................................................36

*United States v. Mitchell*,
    39 F.3d 465 (4th Cir. 1994) ...................................................................45

*United States v. Opdahl*,
    930 F.2d 1530, 1534-36 (11th Cir. 1991 ..............................................43

*United States v. Pacquette*,
    557 Fed.Appx. 933, 935-36 (11th Cir. 2014) ................. 27, 31, 33, 35, 36, 37, 49

*United States v. Place*,
    693 F.3d 219, 228–29, n. 12 (1st Cir. 2012) .......................................45

*United States v. Range*,
    94 F.3d 614, 620 (11th Cir. 1996) ............................................... 24, 32

*United States v. Reme*,
    738 F.2d 1156, 1167 (11th Cir. 1984), *cert. denied* ...........................55

*United States v. Rodriguez*,
    765 F.2d 1546, 1555 (11th Cir. 1985) ...............................................55

*United States v. Rosales-Bruno*,
    789 F.3d 1249, 1256 (11th Cir. 2015) .......................................... 26, 57

*United States v. Ruiz*,
    59 F.3d 1151, 1154 (11th Cir. 1995) ..................................................43

*United States v. Sanchez*,
    269 F.3d 1250, 1272 (11th Cir.2002) .................................................25

*United States v. Vicaria*,
    12 F.3d 195, 198-99 (11th Cir. 1994)..................................................43

*United States v. Walton*,
    908 F.2d 1289, 1302 (6th Cir. 1990), *cert. denied,* 498 U.S. 990 (1990)............56

*United States v. Woodard*,
    459 F.3d 1078, 1087 (11th Cir. 2006) ................................................26

*United States v. Yates*,
    438 F.3d 1307, 1311 (11th Cir. 2006) ................................................24

*Washington v. Texas,*
  388 U.S. 14 (1967) ........................................................................ 31, 42

**Statutes**

18 U.S.C. § 545 ...............................................................................2, 46

18 U.S.C. § 554 ...............................................................................2, 45

18 U.S.C. § 1503(a) .............................................................................2

**Other Authorities**

Ben Phalen, "Overview of Current Ivory Law," *PBS's Antiques Roadshow*,
June 22, 2015, updated May 8, 2017. ..................................................47

U.S.S.G. §2B1.1(b)(1)(E) ...................................................................53

U.S.S.G. §2B1.1(b)(1), cmt. n.3(C)......................................................56

U.S.S.G. §2B1.1(b)(1), cmt. n.3(C)(i). .................................................55

**Rules**

Federal Rule of Evidence 106.................................................. 32, 36, 43

Federal Rule of Evidence 401 ......................................................... 43

Federal Rule of  Evidence 611 ............................................................42

Federal Rule of Evidence 611(a) ........................................................32

Rule of Completeness ..................................................... passim

**Regulations**

Title 50, Code of Federal Regulations, Section 14.22........................3, 41

Title 50, Code of Federal Regulations, Section 14.52 ........................................ 3, 39

Title 50, Code of Federal Regulations, Section 14.61 ....................................... 3, 39

Title 50, Code of Federal Regulations, Section 14.63 ............................................. 3

Title 50, Code of Federal Regulations, Section 17.40(e)(3) ............................... 3, 41

Title 50, Code of Federal Regulations, Section 17.40(e)(3)(i)-(vii) ........................ 42

**Constitutional Provisions**

Sixth Amendment, U.S. Constitution ....................................... 24, 32, 42

**STATEMENT OF JURISDICTION**

The District Court had jurisdiction of this case pursuant to 18 U.S.C. § 3231 because the Defendant was charged with an offense against the laws of the United States. The Court of Appeals has jurisdiction over this appeal pursuant to 28 U.S.C. § 1291, which gives the Courts of Appeal jurisdiction over all final decisions of the District Courts of the United States. The notice of appeal was timely filed on March 13, 2023, from the final judgment and commitment order entered on March 6, 2023.

# STATEMENT OF THE ISSUES

## ISSUE I

WHETHER THE DISTRICT COURT, (1) VIOLATED MARTINEZ'S SIXTH AMENDMENT RIGHT TO A FAIR TRIAL OR (2) MISAPPLIED BINDING PRECEDENT UNDER THE RULE OF COMPLETENESS (FRE 106) BY CHERRY-PICKING EXCERPTS FROM THE DEFENDANT'S AIRPORT INTERVIEW WHILE CATEGORICALLY PROHIBITING CROSS-EXAMINATION ON THE RELEVANT BALANCE OF CONTEMPORENEOUS STATEMENTS EXPLAINING WHY THE DEFENDANT BELIEVED HE DID NOT VIOLATE THE LAW.

## ISSUE II

WHETHER THE DISTRICT COURT ERRED BY PRECLUDING THE DEFENSE FROM PRESENTING ANY EVIDENCE, WITNESS EXAMINATION, OR ARGUMENT ABOUT THE ANTIQUE AND *DE MINIMIS* EXCEPTIONS TO THE ENDANGERED SPECIES ACT GIVEN THAT, (1) THOSE EXCEPTIONS DIRECTLY IMPACTED MARTINEZ'S UNDERSTANDING OF HIS LEGAL OBLIGATIONS AND (2) EVIDENCED WHY HE LACKED THE REQUISITE *MENS REA* TO VIOLATE THE IMPORT/EXPORT CRIMES CHARGED.

## ISSUE III

WHETHER THE GOVERNMENT'S CLAIM DURING CLOSING ARGUMENT THAT THE DEFENDANT LOST THE PRESUMPTION OF EVIDENCE WAS PLAIN ERROR.

## ISSUE IV

WHETHER THE TRIAL COURT ERRED BY FAILING TO GRANT THE DEFENDANT'S RULE 29 MOTION TO DISMISS COUNT 14, CHARGING OBSTRUCTION OF JUSTICE.

## ISSUE V

WHETHER THE TRIAL COURT ERRED IN CALCULATING THE DEFENDANT'S SENTENCING GUIDELINE RANGE.

## STATEMENT OF THE CASE

### Course of Proceedings and Disposition

Appellant Eduardo Martinez ("Martinez") is a middle-aged Cuban American art dealer (not conversant in English) who sold antique statuettes containing small amounts of antique ivory. A SDFL grand jury returned a fourteen-count Superseding Indictment charging eight counts of smuggling goods into the United States, in violation of 18 U.S.C. § 545, four counts of smuggling goods outside the United States, in violation of 18 U.S.C. § 554 (collectively, "the Import/Export Counts"), and two counts of obstruction of justice, in violation of 18 U.S.C. § 1503(a). DE:19.

Martinez pled not guilty. DE:30. The court dismissed Count 14 (obstruction of justice). DE:59. Martinez was acquitted of Counts 5, 9, and 11 of the Superseding Indictment. *See* DE:165. Martinez was convicted of the remaining counts. *Id*.

Over objection, the court sentenced Martinez to 51 months' imprisonment, followed by three years' supervised release, and a fine of $20,000. DE:225. Martinez timely filed his Notice of Appeal. DE:228.

### STATEMENT OF THE FACTS

### A. Pretrial and trial orders limit the defense and defense dismissal motions are denied.

The government moved *in limine* to preclude Martinez from presenting any evidence, witness examination, or argument regarding several areas, including the federal regulations governing Antique and *De Minimis* Exceptions to the

Endangered Species Act ("ESA"). DE:124. The Antique and *De Minimis* Exceptions are codified in 50 C.F.R. §§ 14.22 and 17.40(e)(3) (*See* Addendum 1 and 2), and, in essence, allow individuals to import and sell ivory that is at least 100 years old or weighs less than 200 grams.[1]

Simultaneously, the government Motion(ed) to Strike Martinez's Amended Expert Witness Disclosure. DE:127. Martinez responded. DE:142;143. The court granted the government's Motion to Strike Martinez's Amended Expert Witness Disclosure DE:145 and its Motion in Limine to limit Martinez's evidence in his defense DE:151.

In granting the government's Motion in Limine, the court stated, "Whether any of the statues at issue qualify as antiques or contain *de minimis* amounts of ivory is of no consequence to whether Defendant made the proper declarations and filings." DE:151:2. The court held that the Antique and *De Minimis* Exceptions did not have "any bearing on Defendant's guilt" and that this evidence would "only serve to confuse the issues and hinder the jury in properly deciding the case in front of them." DE:151:3. This was error.

While excluding evidence or testimony regarding the Antique and *De Minimis* Exceptions, the court advised "the parties to tread lightly around these issues at trial

---

[1] The Antique and *De Minimis* Exceptions are distinct from the disclosure requirements under 50 C.F.R. §§ 14.52, 14.61, and 14.63. (Addendum 1 and 2).

and to exercise an abundance of caution."  DE:151:4.

Prior to jury selection and then at the end of the first trial day, the court denied Martinez's renewed related requests to reconsider its limine ruling regarding the exceptions to the ESA.  DE:190:2:21-3:16;5:19-6:5;DE:191:87:14-88:4.  The court stated, "I may be wrong.  The Eleventh Circuit is not shy about telling me if I am wrong but doesn't happen all that often so I've ruled."  DE:190:5:19-6:5.

The defense unsuccessfully moved to dismiss claiming, amongst other grounds, the regulations are civil in nature, confusing, and cannot support criminal sanctions. DE:91

### B. <u>Jury instructions required proof of guilty knowledge, but the court's evidentiary rulings precluded "knowledge" and "specific intent" related defense evidence.</u>

The court explained that the elements the government was required to prove beyond a reasonable doubt included willfulness and knowledge:

> One, the Defendant smuggled merchandise into the United States without declaring it for invoicing as required by Customs laws and regulations.  Two, ***the Defendant knew that the merchandise should have been invoiced***.  And three, ***the Defendant acted willfully with intent to defraud the United States***.

DE:191:17:8-13 (emphasis added).

The court also described alternative "knowledge" elements: "the Defendant received, concealed, bought, sold or facilitated the transportation, concealment or sale of the merchandise ***knowing that it had been brought into the United States***

4

*contrary to law*."  DE:191:17:20-23 (emphasis added).  The court instructed, "[t]o act with intent to defraud means to act with the ***specific intent*** to deceive or cheat, usually for personal financial gain…."  DE:191:18:8-10 (emphasis added).

Though excluding mounds of relevant evidence on intent and knowledge, the court instructed that the elements of the export counts also included a knowledge element ("***knowing the goods were intended for exportation, contrary to any law or regulation of the United States***.").  DE:191:18:11-19:3 (emphasis added).

**C.** **The government's opening statement highlights the element of specific intent though the *in limine* orders preclude introduction of relevant defense evidence such as, (1) a confusing group of ESA governing regulations, (2) cross examination about those confusing regulations, and (3) Martinez's full interview statements explaining his lack of specific intent and (mis)understanding of regulations.**

The government's opening statement highlights the importance of the knowledge elements within the Import/Export Counts, stating, "The evidence will show that the Defendant ***knew that it was illegal*** to bring ivory into the United States without declaring it or obtaining the proper permits, but that he did so anyway."  DE:191:21:17-20 (emphasis added).

Over continued objections DE:192:2:4-5:5;49:15-65:25;66:1-3, the court allowed the government to introduce cherry-picked portions of Martinez's September 8, 2021, airport post-*Miranda* interview ("the Interview") through the case agent, Special Agent Victor Penaloza ("Penaloza") of the United States Fish and Wildlife Service ("USFWS") DE:192:84:18-86:19; DE:166: Government

Exhibit ("GX") 601 (audio recording of the Interview)). The court permitted the introduction of a heavily redacted transcript of the full interview which excluded Martinez's statements related to his state of mind. *Compare* DE:166: GX 601A (redacted transcript of the Interview introduced into evidence) *with* Complete and Unredacted Transcript of the Interview (Bates Nos. GEUM_00132854 – 2877) also marked as GX 601A, with redacted portions highlighted, (*See* Appendix); (List of Key Redacted Statements from the Interview, attached hereto as Addendum 4).

The defense argued that under the Rule of Completeness, Martinez was entitled to have the jury consider the entire Interview (or at least additional statements Martinez made to law enforcement). DE:192:2:24-3:1;58:17-25. The court excluded portions of Martinez's Interview that directly travel to the key questions for the jury – i.e., whether Martinez **knew** that his actions violated any law. The court erred in essentially ruling that Martinez's state of mind was not relevant.

Martinez sought to introduce his relevant and more complete and explanatory statements during the Interview. He unsuccessfully asked the court to allow him to address the requisite *mens rea* to commit the alleged crimes and to clarify portions of the interview that the government presented. The court ruled that the additional statements the defense sought to introduce were inadmissible under the Rule of Completeness. DE:192:3:4-12;3:22-25;58:20-60:18;62:20-24;63:11-64:4;64:5-13.

The court excluded no less than six statements (*See* Appendix) essential to

clarify, explain and give a fair meaning to the other portions of the airport interrogation introduced into evidence.

**D. The court excluded many of Martinez's Interview statements such that the portions prejudicially admitted presented a false and incomplete portrayal of Martinez's true words and intent.**

The excluded statements demonstrate that Martinez lacked the requisite *mens rea* to commit the crimes charged in Counts 1 through 12 of the Superseding Indictment. These six excluded statements were relevant to the key defense in the case – Martinez's knowledge and intent. The admission of those excluded statements was essential to provide the jury with a complete understanding of Martinez's state of mind and the real tenor of the Interview.

In the first key exchange, the court allowed the government to introduce the following portion of the Interview:

Agent[2]:    But it is very important that, you know, when you enter or leave the country with ivory, you must declare it.
Martinez:    I know.

GX 601A at 8.[3] Over defense objection, the court excluded Martinez's immediate

---

[2]    USFWS Special Agent Penaloza.

[3]    The government represented that while introduced GX 601A does not identify the different speakers, it separates the speakers by different text boxes. *See* DE:192:54:11-22. However, an examination of GX 601A demonstrates that the same speaker often spans two or more text boxes. Understanding the full context of the interview was required to identify the specific speaker. The court prejudicially prevented the jury from doing so.

explanation of *why* he (Martinez) believed that his conduct did not violate any law, preventing the jury from hearing the following exchange:

Agent:      So, you knew.
Martinez:   But I've had cases…
Agent:      Yes
Martinez:   **I've had cases of clients that have taken pieces and there, at Customs, they've been held, with complete figures, and they've proven that the piece is over one hundred years old and they've not had any problem.**
Agent:      (Nods.). Okay.
Martinez:   **The problem is with new ivory, Chinese things, and the like.  That is the real problem because they are things made of new things.**

*Compare* GX 601A at 8-9 *with* Unredacted Transcript at 8-9 (GEUM_00132861 – 2862) (*See* Appendix 4 - for full exchange).

Martinez possessed antiques, not new ivory.  Rather than "admit" he knew he was required to declare his antique ivory, Martinez explained why he ***did not*** believe he had any such declaration responsibility (that is, because his ivory was ***not*** new). The ruling excluding this exchange allowed the government to repeatedly mischaracterize the nature of Martinez's state of mind by selecting only the most inculpatory portions of his statements to law enforcement.

Similarly, in the second key passage, the court allowed the government to introduce the following exchange:

Agent:      So, you understand everything about CITES, you know.
Martinez:   I do, I do.

GX 601A at 10.  As with the first key passage, the court allowed the government to

mischaracterize the tenor of the Interview by excluding Martinez's statement immediately following the above exchange:

> Martinez:   I also understand that [] I had… now when I am at this situation, I can prove it is one hundred years old and I'm not going to have any problem.  Because with the help of experts, I can prove it is an antique with one hundred per cent certainty, and I'm not going to have problems because it is no[t] new.

*Compare* GX 601A at 10 *with* Unredacted Transcript (*See* Appendix - for full exchange) at 10 (GEUM_00132863) (for full exchange).

Beyond allowing the government to cut short (and mischaracterize) the tenor of these exchanges, the court prevented the defense from introducing or asking about the following four Interview exchanges demonstrating Martinez's true state of mind. Among other exclusions traveling to state of mind, the court allowed the government to redact the following portions of the Interview:

> Agent:       And, are there other, you know, other people here in South Florida selling things, like ivory and bronze pieces?
> Martinez:   **There are many… there are many dealers who sell this. In Florida, it's not unlawful to sell this.**
> Agent:       No, no, of course.
> Martinez:   No, no.
> Agent:       I'm not saying…
> Martinez:   In New York it is illegal.  In New York and California.
> Agent:       Yes.  You're very knowledgeable.  You know a lot about your…
> Martinez:   **Yes, but new things made of ivory.  Because, again, they are antiques.  That's the law, I read it.  Pieces that are over one hundred years old can be traded.**
> Agent:       Even for selling in New York.
> Martinez:   So, if you live in New York, you can come here to Miami,

|           |                                                                         |
|-----------|-------------------------------------------------------------------------|
|           | buy it and take it to New York with you and have it for yourself. What you can't do in New York is selling it, trading it. |
| Agent:    | Having it for yourself.                                                  |
| Martinez: | Yes.                                                                     |
| Agent:    | But that's the point. You're in the business.                           |
| Martinez: | You don't understand.                                                    |
| Agent:    | You understand the law very well.                                        |
| Martinez: | I know because I found…                                                  |
| Agent:    | No, that's the law, that's the law.                                      |
| Martinez: | **It's written. I didn't make this up.**                                |
| Agent:    | No, I can read very well, but as I'm telling you, it doesn't matter.     |
| Martinez: | **That piece never… believe me… I'm going to find experts who can say those pieces are over one hundred years old and so I can have them with me on the plane or bring them in without any problem.** |

*Compare* GX 601A at 17 *with* Unredacted Transcript (*See* Appendix - for full

exchange) at 17 (GEUM_00132870) (emphasis added).

The court also excluded Martinez's following statement:

| Martinez: | **I don't know. Whatever you want, but really, I'm going to prove it's an antique and nothing's going to happen to me.** |
|-----------|-------------------------------------------------------------------------|

*Compare* GX 601A at 18 *with* Unredacted Transcript (*See* Appendix - for full

exchange) at 18 (GEUM_00132871). Martinez believed he was not violating the

law. His state of mind – a constituent element within the jury instructions – was

kept from the jury.

The court also excluded the following exchange:

| Agent: | And the thing is that it won't matter because you have knowledge of the CITES, and you're trading abroad… |
|--------|-------------------------------------------------------------------------|

| | |
|---|---|
| Martinez: | It doesn't matt… I can make it retroactive in a second. |
| Agent: | No, Martinez, Mr. Martinez, Mr. Martinez.  I'm helping you. |
| Martinez: | I'm telling you. |
| Agent: | If you're bringing a piece made of ivory, do you know why is ivory protected?  Let me ask you. |
| Martinez: | **But modern.** |
| Agent: | Do you know why is ivory protected? |
| Martinez: | But modern. |
| Agent: | Modern ivory. |
| Martinez: | For the protection of elephants.  Not there. |
| Agent: | So, yes. |
| Martinez: | **But this was done one hundred and twenty years ago.** |
| Agent: | Yes, but this… |
| Martinez: | It's not within the jurisdiction. |

*Compare* GX 601A at 19 *with* Unredacted Transcript (*See* Appendix 4 - for full exchange) at 19 (GEUM_00132872).  Martinez's belief was that only "modern" ivory – not antique ivory – was prohibited.  Regardless of the legal accuracy of that belief, the jury should have heard that evidence which goes directly to Martinez's state of mind.

Finally, the court also excluded the following:

| | |
|---|---|
| Agent: | The problem is that, as you've said, you have never gotten a CITES. |
| Martinez: | No, because I sell it locally. |
| Agent: | Okay, but that's the problem.  You've never… I don't know.  You know a lot about CITES, but I don't think… I'm not sure if you understand it very well or what. |
| Martinez: | No, the clients… the clients… no, I understand that. |
| Agent: | (Nods.) |
| Martinez: | **The clients buy the pieces and have them for their apartments here and when they're going to export them, they take their permits and take them abroad legally.** |

11

| Agent: | (Nods.) |
| Martinez: | That's the way it works.  A hundred per cent. |
| Agent: | I don't have to tell you anything. |
| Martinez: | If you want, read the law, read the articles and I'm going to prove these pieces are antique.  And I'm going to get a CITES and… |

*Compare* GX 601A at 19-20 *with* Unredacted Transcript (*See* Appendix - for full exchange) at 19-20 (GEUM_00132872–2873).

Excluding the statements, the court ruled that the challenged portions were Martinez's "hearsay statements" and did not "think [they were] going to be admissible."  DE:192:62-65.

The court gutted Martinez's right to a fair trial and theory of defense through exclusion of, (1) exculpatory evidence, (2) testimony, (3) argument, (4) the proposed defense expert, (5) the Antique and *De Minimis* Exception regulations, and (6) the clarifying portions of the Interview.  Martinez could not present a defense case.  *See* DE:161.

During the government's closing, the prosecutor incorrectly, unfairly, and prejudicially stated, "Ladies and gentlemen of the jury, ***the Defendant is no longer presumed innocent***.  The Defendant stands before you guilty as charged in the superseding indictment."  DE:202:35:24-36:1 (emphasis added).  Later at closing, relying on the court's ruling regarding the Interview, the government mischaracterized the true nature of Martinez's explanatory statements to law enforcement and claimed that Martinez "admitted to committing the crime in Count

6." DE:202:63:7-13. As described in his unredacted interview, Martinez thought he acted within the law, regardless of whether that was a correct analysis.

Only because of the exclusion of relevant and exculpatory evidence, the jury convicted Martinez, finding him guilty on Counts 1-4, 6-8, 10, and 12-13, but not guilty on Counts 5, 9, and 11. DE:162.

Martinez moved for acquittal after jury verdict, a new trial, and release pending sentencing and appeal (the "Post-Trial Motions"). DE:184. The government responded to the Post-Trial Motions. DE:187. The District Court did not rule on the Post-Trial Motions, except at sentencing denied Martinez bail.[4]

### E. **The government's Import/Export case.**

This case was not a "whodunnit." The government presented evidence related to each statuette described in the Indictment.

USFWS Inspector Sylvia Gaudio ("Gaudio") discussed the USFWS 3-177 declaration form that she claimed all importers or exporters of any type of wildlife – including antique ivory – are required to submit. DE:191:2-3;58-83. Gaudio testified that she did not find a record in the USFWS system that Martinez submitted a form 3-177 in the previous decade. DE:192:57-58.

---

[4] Because the court denied bond at the conclusion of Martinez's trial (DE:203:14:21-23), that order is ripe for review. A separate bond motion is now pending.

According to the regulations, when someone fails to present something that qualifies as "wildlife" for clearance, USFWS "normally" gives that individual an opportunity to show that the item is legally imported or subject to an exception and "an opportunity to do everything right." DE:192:78-79. Gaudio did not find a record of notice to Martinez, a compliance meeting with Martinez, nor an opportunity for Martinez to provide provenance documentation to USFWS (indicating where an item came from). DE:192:79-81.

Gaudio concluded that none of the constituent ivory was raw. The pieces looked "like antiques" or "older pieces." DE:192:60-61. Although permitted to testify regarding her knowledge of the procedures, protocols, and purposes behind the USFWS's declaration rules, the court prevented counsel from asking Gaudio about the Antique and *De Minimis* Exceptions. DE:191:65-66.

Customs and Border Protection ("CBP") Officer Hector Arbos ("Arbos") searched Martinez's luggage and found "tools" and "little pieces of statues" wrapped in tissue paper. DE:192:11-12;14-15. Arbos testified that during his interview, Martinez "was saying about the hundred years, he just kept going with the hundred years, so the agent explained to him [Martinez] that he [Martinez] was wrong or misinformed I guess." DE:192:20. ***The court limited cross-examination on Martinez's statements about "the hundred years" (i.e., Martinez's clear reference to his belief that there existed an antique ivory exception) and prohibited the***

***defense from getting "into the legal theory."*** DE:192:21-22.

The parties then argued about the cherry-picked recording and redacted transcript of Martinez's Interview. DE:192:49-66. Thereafter, Penaloza testified about Martinez's arrival at Miami International Airport and about portions of his heavily edited and redacted Interview. DE:192:73-103.

The prosecutor led Penaloza through the cherry-picked portions of Martinez's Interview that best fit the government's theory of the case and the court overruled defense objections and excluded questions about portions of the Interview where Martinez communicated his state of mind and belief that he had no declaration obligation on small pieces of antique ivory. DE:192:2:4-5:5;49:15-65:25; 66:1-3;101-102. These cherry-picked portions of the Interview and the heavily redacted transcript (with translation from Spanish into English) were admitted into evidence. DE:192:84:18-86:19; GX601 (recording); 601A (transcript). (*See* Appendix).

The government highlighted the misleading one-sided segment of Martinez's Interview, though Martinez was banned from raising similar topics:

> Q [Prosecutor]:     Okay. And as part of that discussion after you talk about the CITES permit for that piece, you also discuss the need to make declarations of ivory when it enters the country. What did the Defendant say as to whether ivory must be declared when it enters the country?

> A [Penaloza]:     He stated, "I know."

DE:192:97; DE:192:99-100. The court allowed the government to mischaracterize

Martinez's words by excluding Martinez's immediate explanation of *why* he (Martinez) believed that his conduct did not violate any law. *Compare* GX 601A at 8-9 *with* Unredacted Transcript at 8-9 (for full exchange). (*See* Appendix).

The government elicited, for improper purposes, another response that allowed the witness to present a further misleading picture to the jury:

Q [Prosecutor]:    What's happening in this audio clip, Number 12?

A [Penaloza]:    I asked him if there was anything he wanted to change before we ended the interview…. I was giving him examples of if there was anything incorrect, that he could state it to me at this point, ***and he did not want to change any of the statements***.

DE:192:103 (emphasis added).

The case agent's answer is factually and legally misleading in that while Martinez ***explained numerous times why*** he did not believe that he had any disclosure obligations, the court excluded these explanations. Therefore, the agent was allowed to make it appear as though Martinez made nothing except "admissions" furthering the government's theory of the case – i.e., that Martinez "did not want to change any of the statements." *See id.*[5] Martinez's excluded statements were necessary to clarify and explain the portions of the Interview that the government presented. *See, e.g.,* GX 601A Unredacted Transcript at 10 ("I can

---

[5]    Penaloza was allowed to provide the jury with another misleading impression of the Interview during cross-examination when he stated, "Actually, during the interview I provided the Defendant a second chance to rewrite his answers to me." DE:196:97.

prove it is an antique with one hundred per cent certainty, and I'm not going to have problems because it is no[t] new"); 17 ("I'm going to find experts who can say those pieces are over one hundred years old and so I can have them with me on the plane or bring them in without any problem"); 18 ("I'm going to prove it's an antique and nothing's going to happen to me"); 19 ("But this was done one hundred and twenty years ago"); and 20-21 ("If you want, read the law, read the articles and I'm going to prove these pieces are antique"); (*See* Addendum 4 - List of Key Redacted Statements).

During cross, the defense attempted to ask Penaloza about Martinez's Interview statements regarding his (Martinez's) knowledge about the law on importing ivory, but the court sustained the government's objection and shut down the line of questioning. DE:196:62-63. The court also prevented the defense from introducing the recording of the Interview (which discusses pieces of Art Deco from the 1920s) into evidence as a business record. DE:196:65-66;77.

Penaloza testified that Martinez had packages delivered to Francisco Pena ("Pena Jr.") in Miami, and agents interviewed Pena and Pena's father ("Pena Sr."). DE:193:5-9.[6] Penaloza executed a warrant for Martinez's HotMail email account to

---

[6] Pena Sr. testified Martinez had had packages from Europe and Canada delivered through DHL shipping company to his (Pena Sr.'s) home in Miami "[t]wo or three times" and that Martinez later picked up the packages. Martinez sent each package under his own (Martinez's) name. DE:197:44-45.

look for Martinez's "***knowledge*** regarding the declaration of ivory." DE:193:34-35;38 (emphasis added). Martinez communicated by email in Spanish. DE:193:40.

Penaloza testified that Martinez's company, Art Master Collection, did not file 3-177 forms or CITES applications, nor received any CITES permits, from USFWS between April 2012 and October 1, 2021. DE:196:30-31.

Although the court excluded Martinez's Interview statements showing lack of guilty knowledge, Penaloza claimed his investigation was geared towards learning what Martinez ***knew*** about the rules and regulations regarding the import and export of ivory. DE:196:33. Penaloza concluded that Martinez knew the rules and regulations regarding importing and exporting ivory. DE:196:33-42. However, the court's In Limine Order DE:151 and exclusion of Martinez's statements that clarified and explained the admitted portions of the Interview precluded the defense from challenging Penaloza's legal and factual analysis. Penaloza's self-serving conclusion emphasized how vital it was for the government to prove Martinez's ***knowledge***.

The government then called jeweler and art restorer Joel Cabrera. DE:196:32-33. Cabrera testified that he restored small ivory figurines for Martinez. DE:196:36-37. During cross, Cabrera testified that none of the ivory that he worked on for Martinez was "recent ivory," and that all of it was "very old" and "antique." DE:196:61-63;75-76. He claimed that ivory for carving was readily available in the

United States at shows, including the Miami Beach Antique Show.  DE:196:64.
Cabrera testified that "everybody has" and "sells" sculptures like those the
government presented as evidence in the case against Martinez.  DE:196:65;74.

The government then called one of Martinez's customers, Bryan Deboer.
DE:197:4-6.  Deboer, "a collector of bronzes and other Art Deco art" for about
twenty years, testified that he purchased some bronze and ivory statues from
Martinez.  DE:197:6-8;24-25.  Deboer bought antique sculptures from Martinez,
including *The Dolly Sisters*, in June of 2019, for $150,000.  DE:197:12-14.  Deboer
bought twenty additional pieces from Martinez after that purchase.  DE:197:17.

Deboer stopped buying art from Martinez in the Fall of 2019 because the
owner of an antiquities shop in Europe told him (Deboer) "that there was limitations
on ivory."  DE:197:17.  Deboer elaborated that there were "limitations on selling
ivory," stating, "So I did a bit of research over a short period of time, and what I
learned was *it was, to some extent, quite confusing and was difficult to
understand*."  DE:197:18 (emphasis added).

Amy Brisendine, Supervisory Policy Specialist with the USFWS, gave an
overview of the CITES treaty and the interaction between CITES and the USFWS
form 3-177, stating, "within the United States all wildlife needs to be inspected and
cleared by [USFWS], and the form that [USFWS] uses is called the wildlife
declaration form and that's the form 3-177… [which] would accompany that CITES

permit." DE:197:31-35. Brisendine emphasized that form 3-177 is a different requirement than the CITES requirement. DE:197:35.

Although she worked for USFWS since 2001 and was a supervisor, Brisendine testified that she did not know about the exact exceptions/exemptions under the CITES treaty for items that predate the treaty and for household items. *See* DE:197:42-44. The court prevented the defense from asking Brisendine about rules under the ESA and denied the defense's sidebar request. DE:197:51-52. Brisendine testified that the ivory exemptions under CITES "depends on the species and it depends on the country of origin." She did not have the rules related to African elephant ivory "memorized." DE:197:52-53.

USFWS Officer Espinoza then testified that he was "not really sure of" the regulatory components of CITES. DE:197:97-98. The court sustained the government's objections and prevented Espinoza from answering questions about the pre-convention and household decorative item exceptions to CITES. DE:197:98. Nothing suggested to Espinoza that the ivory he examined in relation to Martinez's case was from a recent poaching incident. DE:197:105.

## F. Closing Argument.

During closing, the prosecutor incorrectly, unfairly, and prejudicially stated, "Ladies and gentlemen of the jury, ***the Defendant is no longer presumed innocent***. The Defendant stands before you guilty as charged in the superseding indictment."

DE:202:35:24-36:1 (emphasis added). Relying on the court's ruling excluding the real tenor of Martinez's statements during the Interview, the government mischaracterized the true nature of Martinez's explanatory statements to law enforcement claiming, unfairly, that Martinez "admitted to committing the crime in Count 6." *See id.* at 63:7-13.

### G. <u>The government's Obstruction of Justice case: Count 13.</u>

The government then called Waltford Gonzalez ("Gonzalez"), an art dealer with a specialty in Art Deco and Art Nouveau. DE:197:126-132. Gonzalez knew Martinez typically spoke in Spanish DE:197:132;145 and described a gallery visit where Gonzalez worked to "sort of like coordinate what I [Gonzalez] was going to tell the agents if they ever showed up in my gallery." DE:197:154. Gonzalez clarified that Martinez "never got into really the specifics of what he [Martinez] wanted us to coordinate…." DE:197:155. Gonzalez testified that Martinez asked him (Gonzalez) for invoices from previous sales of bronze and ivory sculptures from the gallery where Gonzalez used to work. DE:197:156-59.

Gonzalez testified that Martinez asked him (Gonzalez) to use an invoice for watercolor paintings to indicate that Gonzalez sold a bronze and ivory sculpture to him (Martinez). DE:197:161-66. There was no proof that the sculpture was charged in the Indictment and Martinez's primary intent was to obtain the real receipt. Gonzalez testified he told Martinez that he (Gonzalez) did not have any records

showing he purchased the sculpture and that Martinez "just wanted me [Gonzalez] to help him because he [Martinez] was very distressed by the entire situation" and was "worried that he [Martinez] was going to lose" his sculptures. DE:197:165-66.

Ionna Romer ("Romer"), Gonzalez's general manager at his art gallery, testified that in November of 2021, Martinez visited the gallery and "went directly to [Gonzalez] and he [Martinez] was talking about e-mails and we [Gonzalez and Martinez] need to agree in whatever we're going to tell them." DE:198:3-7. Romer testified that she understood "them" to be the federal government and that Gonzalez said that he (Gonzalez) did not need to agree with Martinez. DE:198:11.

On cross-examination, Romer stated that she never heard Martinez tell Gonzalez that he (Martinez) wanted Gonzalez to lie to the government. DE:198:23. Romer also testified that Martinez never asked her (Romer) to misrepresent anything to the court. DE:198:24.

## H. Sentencing.

Prior to Martinez's sentencing hearing, the defense objected to the valuation of the sculptures which contained small amounts of antique ivory, arguing that contrary to the more than $550,000 value assessed by the government (and reflected in the PSR), the true fair market value was approximately $128,000. DE:225:4:20-5:12;10:12-19:3; DE:212 (Defendant's Notice of Intent and Motion for Downward Departure and/or Variance) at 11-12; DE:213-215 (Notice of [Defense] Filing

Appraisal Report, Fair Market Value, and Expert Disclosure).

The court opined on Martinez's knowledge and intent stating:

> The trial itself showed that **he still maintained some sort of unreal superior knowledge of the world**, that he was smarter than anybody else and that -- I mean, it looked to me very clearly that he was attempting to avoid the thing **because he didn't think he was doing anything wrong**. He thought that he was either above the law or that **he understood the law better than anybody else**, and therefore he was going forward.

DE:225:7:13-19 (emphasis added).[7]

Martinez's mistaken beliefs about his legal obligation was clear to the court because – **unlike the jury** – the court reviewed Martinez's complete Interview and was aware of the Antiques and *De Minimis* Exceptions that guided Martinez's good faith understanding of his obligations. Similarly, the government also implicitly acknowledged Martinez's (mis)understanding of the law: "[A]ny African elephant ivory imported for commercial purposes… would not have been allowed to enter the country in the first instance, **notwithstanding the Defendant's misinterpretation of the de minimus exception or the antiques exception**." DE:225:30:3-8 (emphasis added).

The court sentenced Martinez to 51 months' imprisonment, followed by three years supervised release, and a fine of $20,000. DE:225.

---

[7] Contradicting its earlier statements, the court later opined that Martinez "clearly showed that he understood what the law was" and "went to great lengths to avoid it." DE:225:45:9-14.

## STANDARDS OF REVIEW

### A. <u>Sixth Amendment, Fair Trial, and Evidentiary Issues</u>

The standard of review is heightened to *de novo* review where the error violates constitutional guarantees. "Although the district court possesses discretionary power to rule on the admissibility of evidence," this Court has cautioned, "its discretion in limiting the scope of cross-examination is subject to the requirements of the Sixth Amendment." *United States v. Diaz*, 26 F.3d 1533, 1539 (11th Cir. 1994) (citing *United States v. Lankford*, 955 F.2d 1545, 1548 (11th Cir.1992)). The requirements of the Sixth Amendment are reviewed *de novo*. *United States v. Yates*, 438 F.3d 1307, 1311 (11th Cir. 2006) (*en banc*) (citations omitted). A district judge's categorical determination that evidence is inadmissible is a conclusion of law, which should be reviewed *de novo*. *See United States v. Ladson*, 643 F.3d 1335, 1341 (11th Cir. 2011).

Ordinarily, "[e]videntiary rulings are reviewed for abuse of discretion." *United States v. Range,* 94 F.3d 614, 620 (11th Cir. 1996). "An abuse of discretion arises when the district court's decision rests upon... an errant conclusion of law, or an improper application of law to fact." *United States v. Baker*, 432 F.3d 1189, 1202 (11th Cir. 2005).

As a general proposition, an error with respect to admission of evidence will result in reversal of a conviction if it had "substantial and injurious effect or

influence in determining the jury's verdict." *Kotteakos v. United States*, 328 U.S. 750, 776 (1946). A more demanding standard of review applies when the error is of constitutional magnitude. *Chapman v. California*, 386 U.S. 18, 22 (1967). "[B]efore a federal constitutional error can be held harmless, the court must be able to declare a belief that it was harmless beyond a reasonable doubt." *Id*. at 24.

## B. **Obstruction Count**

To obtain a conviction under the omnibus obstruction clause, the government must prove that the defendant (1) endeavored, (2) to influence, obstruct or impede the due administration of justice, (3) in a corrupt manner or by threats. *United States v. Barfield*, 999 F.2d 1520, 1522 (11th Cir. 1993). This Court "review[s] the sufficiency of the evidence *de novo*, viewing the evidence and all reasonable inferences and credibility choices in favor of the government and the jury's verdict." *United States v. Ignasiak*, 667 F.3d 1217, 1227 (11th Cir. 2012).

## C. **Sentencing**

This Court reviews the due process claim *de novo* and will reverse the district court only if any error was harmful. *United States v. Sanchez*, 269 F.3d 1250, 1272 (11th Cir.2002) (*en banc*). This Court reviews a district judge's findings of fact concerning the loss amount for clear error and the methodology for calculating loss *de novo*. *United States v. Woodard*, 459 F.3d 1078, 1087 (11th Cir. 2006). A district court abuses its discretion and imposes a substantively unreasonable sentence when

it "(1) fails to afford consideration to relevant factors that were due significant weight, (2) gives significant weight to an improper or irrelevant factor, or (3) commits a clear error of judgment in considering the proper factors." *United States v. Rosales-Bruno*, 789 F.3d 1249, 1256 (11th Cir. 2015).

## SUMMARY OF THE ARGUMENT

The court prevented Martinez from receiving a Constitutionally fair trial on the Import/Export charges (Counts 1-12). The court's erroneous and unconstitutional evidentiary rulings essentially gagged and hogtied Martinez, leaving him utterly defenseless. The court allowed the government to mischaracterize Martinez's state of mind and present a false and misleading picture of what Martinez truly said at his Interview.

To convict Martinez on the Import/Export Counts, the government was required to prove beyond a reasonable doubt that Martinez **knew** that his actions were unlawful. However, by (1) allowing the government to present only cherry-picked portions of the Interview, (2) excluding Martinez's statements necessary to clarify and explain the admitted portions of the Interview which demonstrated Martinez's misunderstanding and lack of specific intent to violate the confusing regulatory law, and (3) excluding any evidence, witness examination, or argument regarding the Antique and *De Minimis* Exceptions, the court prevented Martinez from presenting his valid defense.

In addition to violating the Rule of Completeness (codified in FRE 106 and 611) by preventing Martinez from contemporaneously introducing portions of his Interview necessary to clarify and explain the government's cherry-picked portions, the court also violated three centuries of Supreme Court precedent. These prejudicial violations of Martinez's rights directly led to conviction on many of the Import/Export charges. This Court reversed a similarly unfair trial result in *United States v. Pacquette*, 557 Fed.Appx. 933, 935-36 (11th Cir. 2014).

The court violated Martinez's Due Process, Fair Trial, and Confrontation Clause rights by preventing Martinez "from presenting any evidence, witness examination, or argument regarding" the ***explicit legal basis*** for Martinez's good faith belief that his actions were not unlawful such that he did not have the required guilty intent for conviction. DE:151. The court's rulings prevented Martinez from being able to challenge the specific intent/knowledge element of Counts 1 through 12 of the Superseding Indictment. The court's prejudicial evidentiary ruling is particularly shocking given that – ***as repeatedly acknowledged by nearly all of the government's own witnesses*** – the rules and regulations governing the import and export of ivory are vague, confusing, and contradictory. This deprivation of Constitutional rights is grounds for a new trial.

The evidence presented on the Obstruction of Justice charge (Count 13) was woefully insufficient. In charging Martinez with a federal felony for merely asking

an associate for a receipt and discussing their statements to law enforcement, the government attempts to criminalize protected speech. As "there is no reasonable construction of the evidence from which the jury could have found" Martinez guilty of Obstruction, this Court must reverse and remand Martinez's conviction on this count.

Finally, the trial court erred in calculating Martinez's advisory guideline range. Wholly ignoring (1) market realities, (2) the defense's expert report detailing those realities, (3) confusing regulations under the ESA, and (4) consumer uncertainty impacting value, while also improperly including the value of pieces in the acquitted counts with no evidentiary support, the court misapplied "valuation" of the antique statuettes held to have been illegally imported and exported. The court's error led to Martinez's advisory guidelines range nearly ***doubling*** (from a proper range of 27-33 months to the unreasonable range of 51-63 months). Moreover, given the extraordinarily small percentile of antique ivory as a constituent element within those statuettes, Martinez's 51-month sentence is unreasonable.

## ARGUMENT AND CITATIONS OF AUTHORITY

## I.

**THE DISTRICT COURT VIOLATED MARTINEZ'S RIGHT TO A FAIR TRIAL, MISCONSTRUED AND MISAPPLIED BINDING PRECEDENT APPLYING THE RULE OF COMPLETENESS (FRE 106 and 611) BY CATEGORICALLY PROHIBITING THE DEFENSE FROM PRESENTING THE REAL TENOR AND BALANCE OF MARTINEZ'S INTERVIEW DURING WHICH MARTINEZ REPEATEDLY SAID, IN ESSENCE, THAT HE BELIEVED HE DID NOT VIOLATE THE LAW BY IMPORTING, SELLING, OR TRANSPORTING SMALL PIECES OF ANTIQUE IVORY.**



In a memorable sequence from the 20th Century Fox film, "My Cousin Vinny," a small-town Alabama Sherriff interrogates Bill, a young, innocent New Yorker suspected of murdering a store clerk. When the Sherriff asks Bill when he (Bill) shot the clerk, Bill is thoroughly dumbfounded, believing he has been arrested

for mistakenly shoplifting a can of tuna, and repeats the words, "I shot the clerk…"

When the Sherriff asks the same question again, Bill looks at him questioningly and replies, "I shot the clerk…"  After a deputy calls the Sherriff out of the interrogation room, Bill finally realizes what is happening and screams, "Whoa!  Wait a minute!"  Later, at Bill's preliminary hearing, the Sherriff mischaracterizes the true nature of the exchange and testifies, in essence, that Bill confessed to the murder by replying "I shot the clerk" as a declarative statement, rather than as a confused response to the Sherriff's question.

While some may consider "My Cousin Vinny" one of the greatest legal comedies in cinema history, there is absolutely nothing funny about the way the court allowed the government to mischaracterize and misrepresent Martinez's Interview as "an admission," in violation any sense of Constitutional fairness or the Rule of Completeness.  Preventing a fair trial, and a fair evidentiary presentation, the court, in repeated error, held that the Rule of Completeness did not entitle Martinez to present or to cross-examine Agent Penaloza on Martinez's exculpatory statements during his Interview regarding Martinez's understanding of his legal obligation to declare the import or export of small pieces of antique ivory.  By preventing Martinez from questioning the case agent on Martinez's statements that clarified and explained portions of the Interview that *were* admitted, the court misconstrued binding Eleventh Circuit and Supreme Court precedent.

The Supreme Court has consistently recognized the completeness doctrine in each of the past three centuries, beginning with *Carver v. United States*, 164 U.S. 694 (1897). Long before codified federal rules of evidence, the *Carver* Court stressed the vital role that completeness plays in assuring that an accused receives a fair trial. Since then, the completeness doctrine has been repeatedly cited in enforcing constitutional protections under the Bill of Rights, including the Due Process, Fair Trial, and Confrontation Clauses. *Washington v. Texas,* 388 U.S. 14 (1967) (reversing conviction based on state rule prohibiting defense testimony by one charged in crime); *Chambers v. Mississippi,* 410 U.S. 284 (1973) (conviction reversed based on state's rule of evidence that prohibited cross-examination of incriminating witness about exculpatory prior statements); *Crane v. Kentucky,* 476 U.S. 683 (1986) (reversing conviction, preventing attempt to show confession was unreliable); *Holmes v. South Carolina,* 547 U.S. 319 (2006) (reversing conviction due to state evidence rule excluding defense evidence of third-party guilt).

"Under the common-law 'rule of completeness,' the party 'against whom a part of an utterance has been put in, may in his turn complement it by putting in the remainder, in order to secure for the tribunal a complete understanding of the total tenor and effect of the utterance.'" *United States v. Pacquette*, 557 Fed.Appx. 933, 935-36 (11th Cir. 2014) (citing *Beech Aircraft Corp. v. Rainey*, 488 U.S. 153, 171 (1988) (citation, internal quotation marks and alteration omitted). While the rule of

completeness is partially codified in Federal Rule of Evidence 106, the Eleventh Circuit has "extended the fairness standard in Rule 106 to oral statements 'in light of Rule 611(a)'s requirement that the district court exercise 'reasonable control' over witness interrogation and the presentation of evidence to make them effective vehicles 'for the ascertainment of truth.'" *Id.* (citing *United States v. Baker*, 432 F.3d 1189, 1223 (11th Cir. 2005) (quoting Fed. R. Evid. 611(a)) and *United States v. Range*, 94 F.3d 614, 620-21 (11th Cir. 1996)).

Thus, "the rule of completeness applies… to oral statements through Rule 611(a)." *Id*. There is also a Sixth Amendment basis to the purpose of the rules to allow a fair trial. By its terms, FRE 106 is a rule of admissibility. It provides that a court should permit the introduction of certain writings or statements "that in fairness ought to be considered" when other writings or statements are offered; it does not call for the exclusion of writings or statements that are offered in the first instance.

In *Pacquette*, the Eleventh Circuit held that the defendant's exculpatory statement disclaiming knowledge of cocaine found in his bag after he was stopped by Customs at the airport was admissible under the Rule of Completeness where the defendant's statement was relevant to the primary issue in the case – the defendant's knowledge – and was necessary to clarify the inculpatory statements related by government witnesses. *See* 557 Fed.Appx. at 937.

Like in *Pacquette*, Agent Penaloza's testimony on Martinez's Interview "was technically accurate, but incomplete." *See id.* "By prohibiting cross-examination and excluding [the defendant's] statement merely because it was exculpatory," the district judge in *Pacquette* – like the court in the instant case – "applied an incorrect legal standard and reached an erroneous result" and "abused his discretion." *See id.* Furthermore, as in *Pacquette*, "in a trial primarily about whether" Martinez **knew** that he was required to declare small pieces of antique ivory and **knew** that he was committing a crime in failing to do so, the court's "improper exclusion" of Martinez's repeated explanations of **why** he was not required to file declarations during his Interview cannot be explained away as simply harmless. *See id.* at 938.

Here, the Rule of Completeness required that the jury be allowed to hear Martinez's additional statements to qualify, explain, or place into context the portions of the Interview introduced by the government. *See* FRE 106; *see also United States v. Green*, No. CR415-204-3, 2016 WL 8738040 (S.D. Ga. May 20, 2016) (unreported) (granting, in part, defendant's motion in limine to require the government to play an entire phone call where the unoffered portion provided context to later statements during the same phone call that the government sought to admit).

Here, the government was allowed to introduce the following exchange:

Agent: But it is very important that, you know, when you enter or leave the country with ivory, you must declare it.

33

Martinez:     I know.

GX 601A at 8.   Preventing the defense from cross-examining the agent on Martinez's statements ***immediately following*** this "I know" exchange, where Martinez clarified and explained, in essence, ***why*** he believed that he did not have to declare the small pieces of ivory because they were antiques – and thus did not have the requisite guilty intent to be convicted of the Import/Export Counts (*see* Unredacted Transcript (Appendix at 8) – violated the Rule of Completeness.

Similarly, in the second key passage, the District Court allowed the government to introduce the following misleading exchange, because it was taken in isolation from other explanatory remarks:

Agent:        So, you understand everything about CITES, you know.
Martinez:     I do, I do.

GX 601A at 10.   However, as with the first key passage noted above, the court allowed the government to mischaracterize the tenor of the Interview by excluding Martinez's statements immediately following this exchange.

After Martinez said, "I do, I do," he went on to "explain" and "qualify" this statement, telling the agent, in essence, his belief that he (Martinez) is "not going to have any problem" if he could prove that the pieces he imported were antiques. *See* Unredacted Transcript (Appendix) at 10.   In addition, Martinez's other statements that the court excluded were also necessary to give the jury a full and accurate

portrait of the Interview where Martinez repeatedly and adamantly asserts that he

**did nothing wrong** by importing small pieces of antique ivory.  *See* Appendix.

The importance of these cherry-picked albeit misleading statements from the Interview is exemplified by the government's decision to feature them prominently in its closing argument:

> [W]hen Agent Penaloza asks him [Martinez] in the interview and says but it's very important that, you know, when you enter or leave the country with ivory you must declare it, and the Defendant says I know. He knows that these things must be declared.  He admits it himself in the interview.

DE:202:63:7-12.  The government's characterization of Martinez's statement as an "admission" is inaccurate and misleading given the context of the full Interview and Martinez's immediate clarifying and explanatory statements.  *See Pacquette*, 557 F. App'x. at 937 (noting that although the jury was led to believe otherwise by the government's closing argument, the defendant did, in fact, deny knowledge of the cocaine found in the defendant's bag).

To classify Martinez's statement as an "admission" is akin to describing the following statement as an invitation, "I'd love to have you stay at my house, **but** I would rather have someone rip my toenails off with a rusty pair of pliers."  Focusing only on the first clause ("I'd love to have you stay over at my house") ignores the **context** of the full and complete statement which makes very clear that the speaker would rather be tortured than endure the subject's company.

In an analysis of the Rule of Completeness, favorably citing this Court's holding in *Pacquette*, Judge Grimm eloquently emphasized the rule's importance:

> [T]he rule of completeness… **is tied to the very purpose of the adversary system, which allows the parties to strike blows that are hard but not unfair**. …. If a prosecutor introduces an incomplete version of the defendant's written or oral statement to the investigating officers by eliciting only the inculpatory portions, while leaving out exculpatory ones that, in fairness, would paint a more complete picture and dispel a misleading impression that the jury may have reached having heard only the incomplete portions, then the defendant is at a serious disadvantage.

*United States v. Bailey*, Case No. PWG-16-0246, 2017 WL 5126163, *9-11 (D. Md. Nov. 6, 2017) (unreported) (emphasis added).

Multiple Circuits conclude that even if a portion of a statement is otherwise inadmissible standing alone, fairness may require its admission. *See United States v. Gravely*, 840 F.2d 1156, 1163 (4th Cir. 1988) ("Fed. R. Evid. 106 allows an adverse party to introduce any other part of a writing or recorded statement which ought in fairness be considered contemporaneously. The rule simply speaks the obvious notion that parties should not be able to lift selected portions out of context."); *United States v. LeFevour*, 798 F.2d 977, 980–82 (7th Cir. 1986) ("If otherwise inadmissible evidence is necessary to correct a misleading impression, then either it is admissible for this limited purpose by force of Rule 106 ... or, if it is inadmissible ... the misleading evidence must be excluded too."); *United States v. Green*, 694 F. Supp. 107, 110 (E.D. Pa. 1988) (noting with approval the D.C.

Circuit's holding that Rule 106 permits introduction of evidence that is otherwise inadmissible), *aff'd*, 875 F.2d 312 (3d Cir. 1989)).

The court's ruling improperly omits essential portions clarifying and explaining the admitted statements. Rather than paint a fair picture and address concrete issues of Martinez's knowledge, or lack thereof, the court's ruling created a misleading impression. The short and incomplete version of the Interview admitted at trial over multiple objections was inaccurate, unfair, and unjust.

Martinez no more "admitted" that he knew he was supposed to declare the small pieces of antique ivory he dealt in than Bill "admitted" in "My Cousin Vinny" that he shot the clerk in that Alabama country store. The court's ruling left Martinez with no ability to challenge the Import/Export Counts and deprived him of a fair trial. As it did in *Pacquette*, this Court should remedy this wrong and remand Martinez's case for a new trial.

## II.

**THE COURT ERRED BY PRECLUDING THE DEFENSE FROM PRESENTING ANY EVIDENCE, WITNESS EXAMINATION, OR ARGUMENT ABOUT THE ANTIQUE AND *DE MINIMIS* EXCEPTIONS TO THE ESA GIVEN THOSE EXCEPTIONS DIRECTLY IMPACT MARTINEZ'S (MIS)UNDERSTANDING OF HIS LEGAL OBLIGATIONS AND IMPACT THE REQUISITE *MENS REA* TO PROVE GUILT OF THE CHARGED IMPORT/EXPORT CRIMES.**

### A. <u>The court prevented Martinez from presenting evidence challenging the only contested fact at issue in the Import/Export Counts: Martinez's knowledge, state of mind and intent.</u>

Beyond precluding the introduction of his own statements during an extended law enforcement interview, the court also erred in granting the government's Motion in Limine (DE:124) preventing Martinez "from presenting any evidence, witness examination, or argument" regarding the Antique and *De Minimis* Exceptions. The court's order prevented Martinez from being able to challenge the *knowledge* element of Counts 1 through 12 of the Superseding Indictment.

In granting the government's Motion in Limine, the court stated, "Whether any of the statues at issue qualify as antiques or contain *de minimis* amounts of ivory is of no consequence to whether Defendant made the proper declarations and filings." DE:124 at 2. However, Counts 1 through 12 of the Superseding Indictment *are not* strict liability offenses. In addition to proving the act itself, the government must prove beyond a reasonable doubt that the defendant charged had the *mens rea* to make those actions criminal.

The jury instructions concerning Counts 1 through 8 required proof of the following, beyond a reasonable doubt, evidencing why the excluded evidence prevented a fair trial:

> One, the Defendant **knowingly** or ***fraudulently*** imported or brought the merchandise in question, that is sculptures containing ivory, into the United States. Two, the importation or bringing into the United States was contrary to Title 50 Code of Federal Regulations Section 14.52 and 1461. And three, the Defendant **knew** the importation of sculptures containing ivory was contrary to law.

DE:202:118:19-119:1 (emphasis added). The court excluded evidence about what

Martinez "knew" and instructed the jury that, alternatively, it could find Martinez guilty on Counts 1 through 8 if:

> Merchandise, that is sculptures containing ivory, had been brought into the United States; and two, the Defendant received, concealed, bought, sold or facilitated the transportation, concealment or sale of the merchandise ***knowing*** that it has been brought into the United States contrary to law.

DE:202:119:2-9 (emphasis added). The court instructed the jury that, "To act with intent to defraud means to act with the ***specific intent*** to deceive or cheat, usually for personal financial gain or to cause financial loss to someone else." DE:202:119:12-14 (emphasis added). Notwithstanding its centrality to the "lack of specific intent" and "lack of knowledge" defense, the court excluded evidence of lack of knowledge, lack of intent, and confusion under the governing Antique and *De Minimis* Exceptions.

For Counts 9 through 12, the court instructed the jury that Martinez could be found guilty only if the government proved that the Defendant knew the goods were intended for export against the law. DE:202:119:21-120:4. "Guilty knowledge" was required but valid contradictory defense evidence was excluded.

The court defined "knowingly" for the jury:

> The word "knowingly" means that an act was done voluntarily and intentionally, and not because of a mistake or by accident. If a Defendant's knowledge of a fact is an essential part of a crime, it's enough that the Defendant was aware of a high probability that the fact existed ***unless the Defendant actually believes that the fact did not exist***.

DE:202:122:12-17 (emphasis added). The excluded statements, the excluded impeachment, the excluded regulations, otherwise evidences Martinez's mistake and misunderstanding of the law.

Finally, the court instructed the jury on the concept of "good faith":

> Good faith is a ***complete defense*** to a charge that requires intent to defraud. A defendant isn't required to prove good faith. The government must prove intent to defraud beyond a reasonable doubt.... ***An honestly held opinion or honestly formed belief cannot be fraudulent intent, even if the opinion or belief is mistaken***.

DE:202:123:8-15 (emphasis added). The court excluded evidence of mistake and good faith.

Because Martinez's knowledge was an element the government had to prove beyond a reasonable doubt to convict on Counts 1 through 12, the court erred in precluding the presentation of "any evidence, witness examination, or argument" about the very grounds upon which Martinez based his knowledge.

Throughout the course of the government's investigation and prosecution – and even after his conviction – Martinez has maintained that ***he did not know*** that his actions violated any law. *See* Unredacted Transcript (Appendix); DE:217; DE:234:37:6-38:6. Martinez did not base his firmly-held beliefs on hopes, dreams, or fantasies – he based his beliefs on the ***express terms of the United States Federal Code of Regulations, even if he was legally mistaken***.

As noted above, the Antique and *De Minimis* Exceptions are codified in Title

40

50, Code of Federal Regulations, Sections 14.22 (Addendum 1) and 17.40(e)(3) (Addendum 2). Title 50, Code of Federal Regulations, Section 14.22 states:

> Any person may import at any Customs Service port designated for such purpose, any article… that is at least 100 years old, is composed in whole or in part of any endangered or threatened species listed under § 17.11 or § 17.12 of this subchapter, and has not been repaired or modified with any part of any endangered or threatened species on or after December 28, 1973.

50 C.F.R. § 14.22.

The Appellant asks this Court to take judicial notice of Fish and Wildlife Service Director's Order 210, Appendix 1, Guidance on the Antique Exception under the Endangered Species Act (ESA). (Addendum 3).

Title 50, Code of Federal Regulations, Section 17.40(e)(3) states:

> ***Interstate and foreign commerce of ivory***. Except for antiques and certain manufactured or handcrafted items containing *de minimis* quantities of ivory, sale or offer for sale of ivory in interstate or foreign commerce and delivery, receipt, carrying, transport, or shipment of ivory in interstate or foreign commerce in the course or a commercial activity is prohibited. Except as provided in paragraphs (e)(5)(iii) and (e)(6) through (8) of this section, ***manufactured or handcrafted items containing* de minimis *quantities of ivory may be sold or offered for sale in interstate or foreign commerce***…

50 C.F.R. § 17.40(e)(3) (emphasis added).

Section 17.40(e)(3) then states that commercial activity involving ivory may be carried out without a threatened species permit issued under Section 17.32, provided that several criteria are met, including that "[i]f the item is located outside the United States, the ivory was removed from the wild prior to February 26, 1976"

41

and "[t]he total weight of the ivory component or components is less than 200 grams." *See* 50 C.F.R. § 17.40(e)(3)(i)-(vii). All of Martinez's pieces were Art Deco sculptures created around the 1920s which contained less than 200 grams of ivory.

To be clear, whether Martinez was correct in his analysis of the regulations governing ivory importation and exportation is ***irrelevant*** to the facts that impact the legal analysis of Martinez's ***state of mind***. The impact these regulations had on Martinez's actual declaration obligations under the law is similarly irrelevant to this analysis. What matters is that Martinez had a valid defense – ***based on his understanding (or misunderstanding) of the actual text of the United States Code of Federal Regulations*** – which the court precluded him from raising at trial.

"Whether rooted directly in the Due Process Clause of the Fourteenth Amendment or in the Compulsory Process or Confrontation Clauses of the Sixth Amendment, the Constitution guarantees criminal defendants 'a meaningful opportunity to present a complete defense.'" *Holmes v. South Carolina*, 547 U.S. 319, 324 (2006) (citations omitted). This right encompasses "the right to present the defendant's version of the facts as well as the prosecution's to the jury so it may decide where the truth lies." *Washington v. Texas*, 388 U.S. 14, 19 (1967).

While Federal Rule of Evidence 611 grants wide discretion in controlling the mode and order of presenting evidence, this "discretion does not ... extend to the

exclusion of crucial relevant evidence necessary to establish a valid defense." *United States v. Kelly*, 888 F.2d 732, 743 (11th Cir. 1989). Here, the court excluded "crucial relevant evidence" on elements "necessary to establish a valid defense" to Counts 1 through 12. *See id.*

"[A] defendant's 'mistake of fact' may negate criminal intent, if believed by a jury properly instructed on the law, where the defendant did in fact engage in the conduct giving rise to the charged offense." *United States v. Ruiz*, 59 F.3d 1151, 1154 (11th Cir. 1995) (citing *United States v. Opdahl*, 930 F.2d 1530, 1534-36 (11th Cir. 1991) and *United States v. Vicaria*, 12 F.3d 195, 198-99 (11th Cir. 1994)); *see also*, FRE 106; FRE 401, "Evidence is relevant if: (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action."; *United States v. Finestone*, 816 F.2d 583, 585 (11th Cir. 1987) ("The Federal Rules of Evidence favor admission of any evidence tending to prove or disprove a fact in issue…."); *Butler v. S. Pac. Co.*, 431 F.2d 77, 79 (5th Cir. 1970) ("'the Federal Rules and practice favor admission of evidence rather than exclusion if the proffered evidence has any probative value at all.'").

Responding to Martinez's trial counsel's request to reconsider its ruling *in limine*, the court stated, "I've ruled. ***I may be wrong***. The Eleventh Circuit is not

shy about telling me if I am wrong…."  DE:190:5:19-6:5 (emphasis added).  The

court **was** wrong, and we invite this Court to **say** the lower court was wrong.

**Martinez's statements regarding his good faith belief he committed no**

**crime is supported by the confusing state of the law regarding ivory.**



Martinez's legitimate good faith belief that he did nothing wrong by importing

small pieces of antique ivory is supported by the confusing and contradictory state

of the law regarding the possession, transport, and sale of ivory in this country.  The

rules and regulations regarding the import and export of ivory are about as clear as

mud.  The uncertainty of whether ESA regulations are civil or criminal in nature and

how federal regulations impact the ESA can be viewed in conflicting Circuit decisions. *Compare United States v. Alghazouli*, 517 F.3d 1179, 1180, 1187 (9th Cir. 2008) (reasoning that the word "law" in 18 U.S.C. § 554 must not include regulations, and therefore the regulations are civil in nature, otherwise the later mention of regulations would be superfluous) *with United States v. Mitchell*, 39 F.3d 465 (4th Cir. 1994) (adopting the test from *Chrysler Corp. v. Brown,* 441 U.S. 281, 295–96 (1979)); *see also United States v. Izurieta*, 710 F.3d 1176, 1179–80 (11th Cir. 2013) (stating, "We have not addressed squarely the second question briefed by the parties, and there appears to be a circuit split on the key question as to what 'law' must be violated for importation to be 'contrary to law' under the charged statute, 18 U.S.C. § 545"), *citing United States v. Place,* 693 F.3d 219, 228–29, n. 12 (1st Cir. 2012) (collecting cases)).

Martinez moved to dismiss based on this lack of clarity. DE:91 (Motion to Dismiss); DE:120 (R&R Denial); DE:137 (Objections to R&R); DE:146 (Order Adopting R&R). Beyond seeking dismissal, the predicate of Martinez's Motion to Dismiss lends further support to his claim of honest mistake.

The government concedes that this area of the law is confounding. ***Its Motion in Limine argues that allowing the jury to hear about the Antique and* De Minimis *Exceptions would "only confuse the jury as to the law of the case."*** DE:124 at 3. The law and exceptions regarding the import and export of wildlife, including ivory,

is so dense that the government dedicated **over ten pages** in its Motion in Limine explaining the intricacies and interrelated nature of these rules. *See id*. at 4-15. The government cited **no less than twenty** interrelated statutes, regulations, rules, and treaties to explain *why* it would be "misleading" and "confusing" for the jury to hear any "evidence, witness examination, or argument" about the parts of the law that undermined its theory of the case. ***This confusing detailed exposition of the legal and regulatory landscape supports Martinez's good faith belief that he did not break the law.***

If the government needed to use so much ink to educate a long-serving Federal Judge on the subject, it is reasonable to believe that Martinez had a misunderstanding amounting to a good faith belief that he had no disclosure obligations for importing and exporting small pieces of antique ivory. "[E]ven expert ivory appraisers are often hazy on the law. This is through no fault of their own: The legal regime that regulates the trade in ivory is notoriously complex, arising from the intersection of federal statutory law, executive-branch orders, and the guidelines imposed by international conservation treaties." Ben Phalen, "Overview of Current Ivory Law," *PBS's Antiques Roadshow*, June 22, 2015, updated May 8, 2017, https://www.pbs.org/wgbh/roadshow/stories/articles/2015/6/22/ivory-law/.

The government's own witnesses highlighted the confusing nature of the laws governing the import and export of small pieces of ivory in antique statuettes. When

asked about the rules in this area, the government's main witness, Special Agent Penaloza, testified, "There are certain regulations that allow it and certain that do not allow the importation of ivory to the United States."  DE:197:9.  Again, clear as mud.

The other USFWS and law enforcement officers were similarly circumspect, unsure, untrained, or ignorant about the laws that governed the import and export of ivory.  Although tasked with helping to enforce this nation's customs laws for almost a decade, government witness Arbos testified that he did not ask Martinez "anything about the age or law because *[he (Arbos) was] not familiar with it*."  DE:192:30 (emphasis added).[8]

Similarly, although she had worked for USFWS since 2001 and was a supervisor, government witness Brisendine testified that she did not know about the exact exceptions under the CITES treaty for items that predate the treaty and for household items.  DE:197:42-44.  Likewise, veteran USFWS employee Espinoza testified that he was "not really sure of" the regulatory components of CITES.  DE:197:97-98.  Finally, HSI Special Agent Mondanaro testified that although he became a CBP officer in 2003, joined HSI as a Special Agent in 2008, and was assigned to JFK airport from 2008 to 2016, he received "very minimal" training

---

[8]     Striking unfair blows, the government's theory was why confuse the jurors with *all* the facts when we can just present the ones that strengthen our case and make the Defendant look more guilty?

about art or ivory.  DE:199:3-5.

The government's civilian witnesses were similarly confounded by the rules and regulations surrounding ivory.  When asked about the limitations on selling ivory, one of Martinez's customers, government witness and wealthy executive Bryan Deboer, testified, "So I did a little bit of research over a short period of time, and what I learned was it was, to some extent, *quite confusing and was difficult to understand*."  DE:198:22-24 (emphasis added).  Adding to the confusion about what is legal and what can subject someone to years in federal prison, the sculptures that Martinez bought and sold appear to be ubiquitous in the antique Art Deco world.  Government witness Cabrera testified that "everybody has" and "sells" sculptures like those presented as evidence against Martinez.  DE:196:65;74.

The government's extensive explanation in its Motion in Limine, the CFR's very convoluted text, and the testimony of several government witnesses show that the rules and regulations regarding ivory are a shambolic jumble.  *Those rules which the government agents and government witnesses describe as unclear or confusing, lend themselves to honest, good faith mistakes about what the law requires.*  As such, the court violated Martinez's Constitutional right to a fair trial by preventing the admission of Martinez's own statements and precluding him from addressing in any fashion the Antique and *De Minimis* Exceptions upon which he based his beliefs.  This Honorable Court should reverse Martinez's convictions on

Counts 1-12 and order that he receive a new and fair trial.

## III.

## A NEW TRIAL SHOULD BE ORDERED BECAUSE THE GOVERNMENT CLAIMED AT CLOSING THAT THE DEFENDANT LOST THE PRESUMPTION OF INNOCENCE.

At closing, the prosecutor stated, "Ladies and gentlemen of the jury, ***the Defendant is no longer presumed innocent***. The Defendant stands before you guilty as charged in the superseding indictment." DE:202:35:24-36:1 (emphasis added). This assertion was highly and unfairly prejudicial. *See*, *e.g.*, *Hall v. United States*, 419 F.2d 582, 587 (5th Cir. 1969) (reversing conviction, stating, "The prosecutor may neither dispense with the presumption of innocence nor denigrate the function of the trial nor sit as a thirteenth juror.").

Later in closing argument, relying on the court's ruling regarding the Interview, the government mischaracterized the true nature of Martinez's explanatory statements to law enforcement, claiming that Martinez "admitted to committing the crime in Count 6." DE:202:63:7-13. This Honorable Court in *Pacquette* noted the government's similar misleading use of a defendant's interview statements in closing argument as a basis to reverse conviction. The same should occur here.

## IV.

## THE TRIAL COURT ERRED BY FAILING TO GRANT THE DEFENDANT'S RULE 29 MOTION TO DISMISS THE OBSTRUCTION COUNT.

The evidence presented to convict Martinez of Obstruction of Justice (Count 13) was insufficient as a matter of law and his conviction on this charge must be reversed.  Under this Circuit's binding precedent, "[i]t is not an unlawful attempt to influence or impede a witness, or the due administration of justice, for one to seek to obtain from a witness a statement of the facts as he believes them to be, without the exercise of undue influence, even though such a statement may conflict with prior testimony given by the one making the statement." *United States v. Brand*, 775 F.2d 1460, 1469 (11th Cir. 1985) (citation omitted).  The government alleged that Martinez attempted to "persuade [witness Gonzalez, Martinez's art world acquaintance] to not testify at trial or to otherwise provide false testimony." DE:202:8:11-15.  However, the evidence presented proved no such thing.

Although the government attempted to show that Martinez instructed Gonzalez to "coordinate" his statement to law enforcement with Martinez, the government failed.  When asked the key question of exactly *what* Martinez wanted to "coordinate" with Gonzalez, Gonzalez testified, "Well, *we never got into really the specifics of what he wanted us to coordinate*, but I was very clear that I said

look, I'm not going to lie." DE:198:155:6-13 (emphasis added). Such a vague assertion is insufficient as a matter of law to secure a conviction.

A prospective witness's preemptive assertion to the target of a government investigation that the prospective witness will not lie to the authorities ***does not make that target guilty of obstruction***. Gonzalez never testified that Martinez asked him to lie, much less that Martinez "exercise[d] [] undue influence" to try to get him to do so. DE:198. While this Court must view the evidence in the light most favorable to the government, it may not speculate – as the government did – to stretch testimony and facts to fit a theory of guilt devoid of any evidentiary or legal support.

Likewise, Martinez's attempt to retrieve receipts for prior art purchases from Gonzalez's gallery does not constitute obstruction under the law. Martinez and Gonzalez's discussion did not include a request for presentation of false evidence although, like in *Brand*, Martinez was "hopeful that [Gonzalez], as well as other witnesses…, would agree that the circumstances under which they purchased the" antiques were similar. *See Brand*, 775 F.2d at 1469. As the court should have granted the defense's Rule 29 motion for acquittal for Court 13, this Honorable Court must reverse Martinez's conviction on the Obstruction charge.

# V.

**THE TRIAL COURT, (1) FAILED TO PROVIDE THE PROCESS DUE AT SENTENCING, (2) MISCALCULATED THE LOSS AMOUNT, (3) USED VALUATION FROM ACQUITTED COUNTS UNSUPPORTED BY ANY EVIDENCE, AND (4) IMPOSED AN UNREASONABLE SENTENCE.**

Martinez's Presentence Investigation Report ("PSR") reflects a 14-level upward adjustment because the "market value" of the materials was $592,906, resulting in a Total Offense Level ("TOL") of 24, with a guideline range of 51 to 63 months' imprisonment. DE:210 at ¶¶49;53;87.[9] The government advocated for the same valuation and guidelines range. DE:225:29-36. The valuation largely drove Martinez's guideline range.

Prior to sentencing, the defense filed its Appraisal Report, Fair Market Value Report, and Expert Disclosure, properly calculating the actual "market value" of the pieces as approximately $127,000. DE:213;214;215. This correct value corresponds to an 8-level upward adjustment resulting in a TOL of 18 with a guideline range of 27-33 months' imprisonment.[10] *See* U.S.S.G. §2B1.1(b)(1)(E).

---

[9]    Although the defense did not object, the Probation Office included in its "market value" calculation statues related to counts upon which Martinez was acquitted. Without any finding of fact, the court accepted this "market value" calculation. This was plain error. If the court had simply excluded from its calculation the pieces related to the acquitted conduct, Martinez's guidelines range would have been 41-51 months' imprisonment.

[10]    Martinez meets the criteria for U.S.S.G. Section 4C1.1 (Adjustment for Certain Zero-Point Offenders) which will apply retroactively. Application of the

At sentencing, although the court allotted one hour for the hearing, it refused to allow the defense to call its expert witness on valuation and did not appear to consider the expert's report in any meaningful way. DE:225:6-19. The court overruled the defense's objections and rubberstamped the government's valuation, sentencing Martinez to 51 months' imprisonment. DE:225:4-18;41.

The court based its valuation on two fundamental misunderstandings of the market for antique ivory in the United States at the time of sentencing. First (although due to the court's unconstitutional rulings which allowed the government to present an incomplete and misleading version of events), the jury's verdict established that Martinez's antique Art Deco sculptures were illegal and subject to confiscation. Contrary to the court's presumption (DE:225:5-6), the defense expert Appraisal Report, which accurately echoes the government's own testimony regarding regulatory "confusion" on the merchantability of the antiques, notes, "these regulations [governing the sale of antiques containing amounts of ivory] are hard to decipher and …, the market has reacted by either refusing to offer or sell ivory pieces, … or state their material as something other than ivory… in the hopes of avoiding any detection and/or prosecution" (DE:213-1 at 6). By any measure, the court should have included this factor in its analysis but did not.

---

guideline amendment to the correct valuation calculation results in an adjusted guideline range of 21-27 months' imprisonment.



Second, over defense objection (DE:225:12:12-24;16:7-18), the court calculated at least part of the "market value" of the pieces based on the price Martinez offered to sell them (DE:225:18:20-24). This is directly contrary to U.S.S.G. §2B1.1(b)(1), cmt. n.3(C)(i), which instructs courts to estimate loss based on "[t]he fair market value," rather than "a comparative or hybrid approach" where the court assumes that Martinez *offered* an antique for sale for its fair market value. This approach to valuation defies logic, common sense, and human experience. As anyone who has walked onto a used car lot knows, *the price someone offers something for sale is not necessarily – and usually is <u>not</u> – its fair market value*.

By using the statuettes in counts of acquittal, refusing to permit or consider relevant expert testimony, and excluding consideration of the true "market value," the court, (1) violated Martinez's right to Due Process, (2) did not "…make a reasonable estimate of the loss," and (3) imposed an unreasonable sentence, such that the sentence and the court's loss determination should be reversed and should not be "…entitled to appropriate deference." *See* U.S.S.G. §2B1.1(b)(1), cmt. n.3(C).

### (A) Martinez did not receive the process due at his sentencing.

Due process requires a defendant be given an opportunity to confront any evidence against him and refute it. *United States v. Rodriguez,* 765 F.2d 1546, 1555 (11th Cir. 1985). Through his expert valuation (DE:213-1) – and as shown through the testimony of the government's own witness Bryan Deboer (DE:197:18) – Martinez proved that the government's purported "fair market value" was materially unreliable. The sentencing judge relied on that misinformation, depriving Martinez of his Due Process. *See United States v. Reme,* 738 F.2d 1156, 1167 (11th Cir. 1984), *cert. denied, Pierrot v. United States,* 471 U.S. 1104 (1985).

The trial court failed to compute a loss value commensurate with what Martinez could obtain for antiques that are unmarketable because they violated the law. DE:197:19. Notwithstanding contradictory testimony and expert opinion, the court's valuation of the offending Art Deco antiques unreasonably presumes antique

pieces, with small amounts of antique ivory, could be sold at market for high retail prices. Federal law enforcement's seizure of hundreds of Art Deco pieces from Martinez's home and business (DE:192:77) demonstrates that selling these type of statues is a financially risky proposition in this country.

This potential legal jeopardy, and particularly the uncertainty and confusion of everchanging federal regulations, results in a diminished "fair market value" for these pieces. ***The government's own witness, Bryan Deboer, cited the legal uncertainty surrounding ivory as the reason why he stopped buying antique sculptures containing small amounts of ivory from Martinez.*** (DE:197:18) (stating that he would "rather be safe than sorry"). The court's fanciful valuation and disregard for established market realities deprived Martinez of his Due Process rights at sentencing.[11]

### (B) Martinez's 51-month sentence is unreasonable.

The court abused its considerable discretion and imposed a substantively unreasonable sentence, because it "(1) fail[ed] to afford consideration to relevant factors that were due significant weight, (2) [gave] significant weight to an improper or irrelevant factor, or (3) commit[ed] a clear error of judgment in considering the

---

[11]    Where the fair market value ranges between two estimates and either range is equally plausible, courts generally should adopt the lower end of the estimated range. *See United States v. Walton,* 908 F.2d 1289, 1302 (6th Cir. 1990), *cert. denied,* 498 U.S. 990 (1990) (stating, "[w]hen choosing between a number of plausible estimates of drug quantity, a court must err on the side of caution.").

proper factors." *See United States v. Rosales-Bruno*, 789 F.3d 1249, 1256 (11th Cir. 2015).



Further straining the limits of fundamental fairness and common sense, the court's valuation included the entirety of each statue – even including those of acquittal – though the pieces were mostly made of bronze and marble and contained only a very small quantity of ivory. Using the "market value" of the entire statues for guidelines purposes is akin to using the "market value" of an entire vintage Rolls Royce with a contraband ivory gearshift. Such a result is unjust, and, in this case, resulted in an unreasonable sentence. Fairness dictates that "market value" should be limited to the value of the ivory.

**CONCLUSION**

This Honorable Court must grant a new trial or, alternatively, remand for resentencing using the proper "fair market value" of the statues Martinez was convicted of importing and exporting.

Respectfully submitted,

*/s/ Neil M. Schuster*
Neil M. Schuster
Counsel for Appellant
555 NE 15th Street
Suite 2C
Miami, FL 33132
Telephone: 305-416-0324
Facsimile: 305-416-0325
Email: neil@neilmschuster.com

## CERTIFICATE OF COMPLIANCE

I CERTIFY that this document complies with the word limitations of Fed. R. App. P. ("Rule") 27(d)(2)(A) because it contains 12,738 words, excluding the parts of the document exempted by Rule 32(f).

This document complies with the typeface requirements of Rule 32(a)(5) and the type-style requirements of Rule 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word in a 14-point Times New Roman font.

By:   /s/ Neil M. Schuster
                 Neil M. Schuster

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that the foregoing initial brief was filed with the Clerk of Court via CM/ECF on this 4th day of December, 2023, and thereby serving a copy to all interested parties.

By:   /s/ Neil M. Schuster
                 Neil M. Schuster

# ADDENDUM 1

**50 CFR 14.22 (up to date as of 4/07/2023)**
Certain antique articles.

**50 CFR 14.22**

This content is from the eCFR and is authoritative but unofficial.

# Title 50 – Wildlife and Fisheries
# Chapter I – United States Fish and Wildlife Service, Department of the Interior
# Subchapter B – Taking, Possession, Transportation, Sale, Purchase, Barter, Exportation, and Importation of Wildlife and Plants
# Part 14 – Importation, Exportation, and Transportation of Wildlife
# Subpart B – Importation and Exportation at Designated Ports

**Authority:** 16 U.S.C. 668, 704, 712, 1382, 1538(d)–(f), 1540(f), 3371–3378, 4223–4244, and 4901–4916; 18 U.S.C. 42; 31 U.S.C. 9701; Pub. L. 115–334, 132 Stat. 4490.

**Source:** 45 FR 56673, Aug. 25, 1980, unless otherwise noted.

## § 14.22 Certain antique articles.

Any person may import at any Customs Service port designated for such purpose, any article (other than scrimshaw, defined in 16 U.S.C 1539(f)(1)(B) and 50 CFR 217.12 as any art form that involves the etching or engraving of designs upon, or the carving of figures, patterns, or designs from, any bone or tooth of any marine mammal of the order Cetacea) that is at least 100 years old, is composed in whole or in part of any endangered or threatened species listed under § 17.11 or § 17.12 of this subchapter, and has not been repaired or modified with any part of any endangered or threatened species on or after December 28, 1973.

*[61 FR 31868, June 21, 1996]*

ADDENDUM 1

# ADDENDUM 2

This content is from the eCFR and is authoritative but unofficial.



Title 50 —Wildlife and Fisheries
Chapter I —United States Fish and Wildlife Service, Department of the Interior
Subchapter B
—Taking, Possession, Transportation, Sale, Purchase, Barter, Exportation, and Importation of Wildlife and Plants
Part 17 —Endangered and Threatened Wildlife and Plants
Subpart D —Threatened Wildlife

## § 17.40 Special rules—mammals.

(a) Mazama pocket gophers (Olympia, Roy Prairie, Tenino, and Yelm) (*Thomomys mazama pugetensis, glacialis, tumuli,* and *yelmensis*)—

(1) *Which populations of the Mazama pocket gopher are covered by this special rule?* This special rule covers the four Thurston/Pierce subspecies of the Mazama pocket gopher (Olympia, Roy Prairie, Tenino, and Yelm) (*Thomomys mazama pugetensis, glacialis, tumuli,* and *yelmensis*) wherever they occur.

(2) *What activities are prohibited?* Except as noted in paragraphs (a)(3) through (7) of this section, all prohibitions of § 17.31 apply to the Olympia, Roy Prairie, Tenino, and Yelm pocket gophers.

(3) *What activities are allowed on civilian airports?* Incidental take of the Olympia, Roy Prairie, Tenino, and Yelm pocket gophers will not be a violation of section 9 of the Act, if the incidental take results from non-Federal routine maintenance activities in or adjacent to Mazama pocket gopher habitat and associated with airport operations on civilian airports. Routine maintenance activities include the following:

(i) Routine management, repair, and maintenance of runways, roads, and taxiways (does not include upgrades, or construction of new runways, roads, or taxiways, or new development at airports);

(ii) Hazing of hazardous wildlife;

(iii) Management of forage, water, and shelter to reduce the attractiveness of the area around airports for hazardous wildlife; and

(iv) Control or other management of noxious weeds and invasive plants through mowing, discing, herbicide and fungicide application, fumigation, or burning. Use of herbicides, fungicides, fumigation, and burning must occur in such a way that nontarget plants are avoided to the maximum extent practicable.

(4) *What agricultural activities are allowed on non-Federal lands?* Incidental take of the Olympia, Roy Prairie, Tenino, and Yelm pocket gophers will not be a violation of section 9 of the Act, if the incidental take results from agricultural or horticultural (farming) practices implemented on such lands consistent with State laws on non-Federal lands. For the purposes of this special rule, farm means any facility, including land, buildings, watercourses, and appurtenances, used in the commercial production of crops, nursery or orchard stock, the propagation and raising of nursery or orchard stock, livestock or poultry, or livestock or poultry products.

(i) For the purposes of this special rule, an agricultural (farming) practice means a mode of operation on a farm that:

(A) Is or may be used on a farm of a similar nature;

(B) Is a generally accepted, reasonable, and prudent method for the operation of the farm to obtain a profit in money;

(C) Is or may become a generally accepted, reasonable, and prudent method in conjunction with farm use;

(D) Complies with applicable State laws; and

(E) Is done in a reasonable and prudent manner.

(ii) Accepted agricultural or horticultural (farming) practices include:

(A) Grazing;

(B) Routine installation, management, and maintenance of stock water facilities such as stock ponds, berms, troughs, and tanks, pipelines and watering systems to maintain water supplies;

(C) Routine maintenance or construction of fencing;

(D) Planting, harvest, fertilization, harrowing, tilling, or rotation of crops (Disturbance to the soils shall not exceed a 12-inch (30.5-cm) depth. All activities that do not disturb the soil surface are also allowed, such as haying, baling, some orchard and berry plant management activities, etc.);

(E) Maintenance of livestock management facilities such as corrals, sheds, and other ranch outbuildings;

**ADDENDUM 2**

    (3)  Salvage a dead specimen which may be useful for scientific study.

  (C)  Designated employees or agents of the Service or the Minnesota Department of Natural Resources may take a gray wolf without a permit in Minnesota, in zones 2, 3, 4, and 5, as delineated in paragraph (d)(l) of this section, in response to depredations by a gray wolf on lawfully present domestic animals: Provided, that such taking must occur within one-half mile of the place where such depredation occurred and must be performed in a humane manner: And provided further, that any young of the year taken on or before August 1 of that year must be released.

  (D)  Any taking pursuant to paragraph (d)(2)(i)(A), (d)(2)(i)(B), or (d)(2)(i)(C) of this section must be reported by email to the Twin Cities Ecological Service Field Office at *twincities@fws.gov* within 5 days. The specimen may only be retained, disposed of, or salvaged in accordance with directions from the Service.

  (E)  Any employee or agent of the Service or the Minnesota Department of Natural Resources, when operating under a Cooperative Agreement with the Service signed in accordance with section 6(c) of the Endangered Species Act of 1973, who is designated by the Service or the Minnesota Department of Natural Resources for such purposes, may, when acting in the course of his or her official duties, take a gray wolf in Minnesota to carry out scientific research or conservation programs.

  (ii)  ***Export and commercial transactions.*** Except as may be authorized by a permit issued under § 17.32, no person may sell or offer for sale in interstate commerce, import or export, or in the course of a commercial activity transport, ship, carry, deliver, or receive any Minnesota gray wolf.

  (iii)  ***Unlawfully taken wolves.*** No person may possess, sell, deliver, carry, transport, or ship, by any means whatsoever, a gray wolf taken unlawfully in Minnesota, except that an employee or agent of the Service, or any other Federal land management agency, or the Minnesota Department of Natural Resources, who is designated by his/her agency for such purposes, may, when acting in the course of his official duties, possess, deliver, carry, transport, or ship a gray wolf taken unlawfully in Minnesota.

(3)  ***Permits.*** All permits available under § 17.32 (General Permits—Threatened Wildlife) are available with regard to the gray wolf in Minnesota. All the terms and provisions of § 17.32 apply to such permits issued under the authority of this paragraph (d)(3).

(e)  African elephant (*Loxodonta africana*). This paragraph (e) applies to any specimen of the species *Loxodonta africana* whether live or dead, including any part or product thereof. The African Elephant Conservation Act (16 U.S.C. 4201 *et. seq.*), and any moratorium under that act, also applies. Except as provided in paragraphs (e)(2) through (9) of this section, all of the prohibitions and exceptions in §§ 17.31 and 17.32 apply to the African elephant. Persons seeking to benefit from the exceptions provided in this paragraph (e) must demonstrate that they meet the criteria to qualify for the exceptions.

(1)  ***Definitions.*** In this paragraph (e), *antique* means any item that meets all four criteria under section 10(h) of the Endangered Species Act (16 U.S.C. 1539(h)). *Ivory* means any African elephant tusk and any piece of an African elephant tusk. *Raw ivory* means any African elephant tusk, and any piece thereof, the surface of which, polished or unpolished, is unaltered or minimally carved. *Worked ivory* means any African elephant tusk, and any piece thereof, that is not raw ivory.

(2)  ***Live animals and parts and products other than ivory and sport-hunted trophies.*** Live African elephants and African elephant parts and products other than ivory and sport-hunted trophies may be imported into or exported from the United States; sold or offered for sale in interstate or foreign commerce; and delivered, received, carried, transported, or shipped in interstate or foreign commerce in the course of a commercial activity without a threatened species permit issued under § 17.32, provided the requirements in 50 CFR parts 13, 14, and 23 have been met.

(3)  ***Interstate and foreign commerce of ivory.*** Except for antiques and certain manufactured or handcrafted items containing *de minimis* quantities of ivory, sale or offer for sale of ivory in interstate or foreign commerce and delivery, receipt, carrying, transport, or shipment of ivory in interstate or foreign commerce in the course of a commercial activity is prohibited. Except as provided in paragraphs (e)(5)(iii) and (e)(6) through (8) of this section, manufactured or handcrafted items containing *de minimis* quantities of ivory may be sold or offered for sale in interstate or foreign commerce and delivered, received, carried, transported, or shipped in interstate or foreign commerce in the course of a commercial activity without a threatened species permit issued under § 17.32, provided they meet all of the following criteria:

  (i)  If the item is located within the United States, the ivory was imported into the United States prior to January 18, 1990, or was imported into the United States under a Convention on International Trade in Endangered Species of Wild Fauna and Flora (CITES) pre-Convention certificate with no limitation on its commercial use;

  (ii)  If the item is located outside the United States, the ivory was removed from the wild prior to February 26, 1976;

  (iii)  The ivory is a fixed or integral component or components of a larger manufactured or handcrafted item and is not in its current form the primary source of the value of the item, that is, the ivory does not account for more than 50 percent of the value of the item;

  (iv)  The ivory is not raw;

  (v)  The manufactured or handcrafted item is not made wholly or primarily of ivory, that is, the ivory component or components do not account for more than 50 percent of the item by volume;

  (vi)  The total weight of the ivory component or components is less than 200 grams; and

  (vii)  The item was manufactured or handcrafted before July 6, 2016.

(4)  ***Import/export of raw ivory.*** Except as provided in paragraphs (e)(6) through (9) of this section, raw ivory may not be imported into or exported from the United States.

# ADDENDUM 2

# ADDENDUM 3

 **United States Department of the Interior**

FISH AND WILDLIFE SERVICE
Washington D.C. 20240



**Director's Order 210, Appendix 1**
**Guidance on the Antique Exception under the Endangered Species Act (ESA)**

**1. What is the antique exception to the prohibitions of the ESA?**

- The ESA Amendments of 1978 amended the 1973 Act (16 U.S.C. 1539 (h)) to allow the importation and other activities without an ESA permit of an antique article (referred to as an "ESA antique") that:

  A. Is not less than 100 years of age;

  B. Is composed in whole or in part of any endangered species or threatened species listed under section 1533 of the Act;

  C. Has not been repaired or modified with any part of any such species on or after December 28, 1973; and

  D. Is entered at a port[1] designated for the import of ESA antiques.

- The prohibitions under 16 U.S.C. 1533(d) and 16 U.S.C. 1538 (a) and (c)[i] will not be enforced against items that meet elements A, B, and C above but not element D and were imported prior to September 22, 1982, or were created in the United States and never imported. Therefore, articles that meet the ESA antique exception may be sold in interstate commerce, imported, exported, and used in other ways that would otherwise be prohibited under the ESA, without an ESA permit.

- The exception requires that any person who wants to import an ESA antique must submit documentation to establish that the article meets the exception. All activities must be consistent with other applicable laws, such as import and export under the African Elephant Conservation Act, the Marine Mammal Protection Act, and the Wild Bird Conservation Act.

---

[1] U.S. Customs and Border Protection (CBP) designated 13 ports for the entry of antiques made of ESA-listed species on September 22, 1982 (19 C.F.R. 12.26). The following ports are authorized: Boston, Massachusetts; New York, New York; Baltimore, Maryland, Philadelphia, Pennsylvania; Miami, Florida; San Juan, Puerto Rico; New Orleans, Louisiana; Houston, Texas; Los Angeles, California; San Francisco, California; Anchorage, Alaska, Honolulu, Hawaii; and Chicago, Illinois.

**ADDENDUM 3**

- The ESA also requires that any person claiming an exemption from the prohibitions of the Act has the burden of proving that the exemption is applicable (16 U.S.C. 1539 (g)).

## 2. What are the requirements to import an antique made from an ESA-listed species?

- ESA antiques may only be imported at a port designated for the import of ESA antiques.[1]
- The import of ESA antiques requires the importer or his/her agent to file Form 3-177, (19 C.F.R. 10.53 (e) and 50 C.F.R. 14.61) with documentation demonstrating that the item meets the ESA exception.
- For ESA antiques made from species that are also listed under the Convention on International Trade in Endangered Species of Wild Fauna and Flora (CITES), the importer or the importer's agent must file Form 3-177 and all required documentation directly with the Service.
- For ESA antiques made from species that are not listed under CITES, the importer or the importer's agent may file Form 3-177 and all accompanying documentation with the U.S. Customs and Border Protection (CBP) Port Director. CBP will send all documentation to the Service as described in 19 C.F.R. 12.26(g) for a legal determination prior to release. The importer or the importer's agent may also file directly with the Service and provide the necessary clearance to CBP.
- The commercial import of ESA antiques must meet all licensing and fee requirements in 50 C.F.R. Part 14.
- The import of ESA antiques made from species that are also listed under CITES requires a pre-Convention certificate issued by the CITES Management Authority of the (re)exporting country as part of the declaration (50 C.F.R. 23.45).[i]
- The import of ESA antiques does not require an ESA import permit.
- The importer must provide evidence of species identification and age to demonstrate that the article qualifies as an ESA antique. This can include a qualified appraisal, documents that provide detailed provenance, and/or scientific testing. The Service considers this to be a high bar. Notarized statements or affidavits by the importer or a CITES pre-Convention certificate alone are not necessarily adequate proof that the article meets the ESA exception.

## 3. What are the requirements to export an antique made from an ESA-listed species?

- ESA antiques may only be exported at a Service-designated port or at a port authorized under a designated port exception permit.

**ADDENDUM 3**

- The export of ESA antiques must meet all the standard declaration, license, fee, notification, and clearance requirements of 50 C.F.R. Part 14. CBP is not involved in the export of such antiques.
- The export of ESA antiques does not require an ESA export permit.
- The export of ESA antiques from species that are also listed under CITES requires a pre-Convention certificate issued by the U.S. CITES Management Authority as part of the export declaration (50 CFR 23.45).[i]
- The exporter must prove that the antique article meets the criteria under the ESA antique exception.

**4. How does the U.S. importer document the identification of the species used in the ESA antique?**

The person claiming the benefit of the ESA antique exception must prove the identity of the species of which the article is composed in whole or in part. Such proof can be in the form of bona fide DNA analysis, a qualified appraisal, or other documentation that demonstrates the identification of the species through a detailed provenance of the article.

**5. How does the U.S. importer document the age of the ESA antique?**

The person claiming the benefit of the ESA exception must prove that the article is not less than 100 years of age. Such proof can be in the form of testing using scientifically approved aging methods by a laboratory or facility accredited to conduct such tests, a qualified appraisal, or another method that documents the age by establishing the provenance of the article. The provenance may be determined through a detailed history of the article, including but not limited to family photos, ethnographic fieldwork, or other information that authenticates the article and assigns the work to a known period of time or, where possible, to a known artist.

**6. How does the U.S. exporter or seller within the United States document that their article meets the ESA exception for antiques?**

The burden of proof is on the exporter or seller to show that the antique article meets the criteria under the ESA exception. Notarized statements or affidavits by the exporter or seller or a CITES pre-Convention certificate alone are not necessarily adequate proof that the article meets the ESA exception.

**7. What will the Service accept as a qualified appraisal?** An appraisal submitted as documentary evidence of an article's eligibility under the ESA antique exception must meet the following criteria:

**ADDENDUM 3**

- The person executing the appraisal either has earned an appraisal designation from a recognized professional appraiser organization for demonstrated competency in appraising the type of property being appraised, or can demonstrate verifiable education and experience in assessing the type of property being appraised.
- The person executing the appraisal is not the importer, exporter, buyer, recipient, or seller of the article and does not benefit from the results of the appraisal (other than for the cost of the appraisal); is not a party to any of the transactions associated with the article (including any person acting as an agent for the transaction); is not an employee of any business that is a party to the transaction; and is not related to the person claiming the exception.
- Facts the Service will examine in determining the reliability of the appraisal:
  - A description of the article that is detailed enough for a person who is not generally familiar with the type of article to determine that the appraisal is about the article in question.
  - The name and address of the qualified appraiser, or if the appraiser is a partner, an employee, or an independent contractor engaged by a person other than the person claiming the exception, the name and address of the partnership or the person who employs or engages the appraiser.
  - The qualifications of the appraiser who signs the appraisal, including the background, experience, education, and any membership in professional appraiser associations.
  - The date on which the article was appraised.
  - The scientific, or other, method in detail used to determine the age or species.
  - Descriptive information on the article, including but not limited to: the size of the article, the medium, the artist or culture, approximate date the article was created, and a professional quality image of the article.
  - A detailed history of the article, including proof of authenticity.
  - The facts on which the appraisal was based including analyses of similar works by the artist on or around the creation date.

## 8. What articles do not qualify for the antique exception under the ESA?

- Articles that are less than 100 years old.
- Articles that are not composed in whole or in part of an ESA-listed species.
- Articles with repairs or modifications made on or after December 28, 1973, to the specific part or component of the article that is made of the ESA-listed species

**ADDENDUM 3**

regardless of the age or origin of the parts used to repair or modify the specimen.[2]

- Articles that have been repaired with the addition of any part of the ESA-listed species or modified with the addition of any part of the ESA-listed species on or after December 28, 1973, regardless of the age or origin of the parts used to repair or modify the specimen.
- Articles that are, or were, imported on or after September 22, 1982, at a port that was not designated for ESA antiques.

## 9. What other information do I need to know?

- The Lacey Act (16 U.S.C. 3372(d)) makes it unlawful for any person to make or submit any false record, account, label for, or any false identification of any fish, wildlife, or plant which has been, or is intended to be, (1) imported, exported, transported, sold, purchased, or received from any foreign country; or (2) transported in interstate or foreign commerce.
- Whoever knowingly and willfully falsifies, conceals, or covers up, by any trick, scheme, or device, a material fact; makes any materially false, fictitious, fraudulent statement or representation; or makes or uses any false writing or document knowing the same to contain any materially false, fictitious, or fraudulent statement or entry; may be subject to penalties under 18 U.S.C. 1001.

[i] Although the ESA includes section 1538 (c) in the introductory exception language of 16 U.S.C. 1539(h)(1), it is consistent with fulfilling our treaty obligations when a CITES specimen is at issue. An interpretation that section 1539(h) exempts an importer or exporter from CITES pre-Convention requirements results in reading section 1539(h) as Congress repealing U.S. treaty obligations both with regard to the Article VII pre-Convention certificate requirement and the Articles II and VIII enforcement provisions as applied to pre-Convention specimens. We are not aware of any information that would indicate that this was Congress' intent when it amended the ESA in 1978.

CITES does not allow Parties to take general reservations from Convention provisions (Article XXIII paragraph 1). We consider section 1539(h)(1) as acknowledgement that the standard import/export document provisions of Articles III, IV, and V would not apply and the Article VII, paragraph 2 pre-Convention certificate requirement is consistent with the section 1539(h)(1)(A) requirement to present evidence of the age of the item in order to qualify for the exemption. In addition, the authority base for the Service's development of the 50 CFR part 23 regulations is section 1540(f) of the ESA. Nothing in section 1539(h)(1) excuses a person from compliance with regulations under section 1540(f) (see section 1540(a) and (b) (penalties for violations of regulations, either under section 1538(c) or "any other regulation").

[2] Items with repairs or modifications to parts or components of the item not made from an ESA-listed species may be entitled to the exception if all other requirements are met. Items that have been repaired or modified prior to December 28, 1973, may also be entitled to the exception if all other requirements are met.

ADDENDUM 3

# ADDENDUM 4

# ADDENDUM 4

## LIST OF KEY REDACTED STATEMENTS
## FROM THE INTERVIEW

The District Court excluded Martinez's following statements and exchanges from his September 9, 2021, airport post-*Miranda* Interview. These statements were taken from the document marked as GX 601A, (App. DE:174-21) but not introduced into evidence, with redacted portions highlighted (Bates Nos. GEUM_00132854 – 2877) (attached to Martinez's Appendix as DE:29 and DE:174-21). The redacted portions discussed below are in **bold**.

Key Redacted Statement One:

| | |
|---|---|
| Agent[1]: | But it is very important that, you know, when you enter or leave the country with ivory, you must declare it. |
| Martinez: | I know. |
| **Agent:** | **Okay. So, you knew.** |
| **Martinez:** | **But I've had cases…** |
| **Agent:** | **Yes** |
| **Martinez:** | **I've had cases of clients that have taken pieces and there, at Customs, they've been held, with complete figures, and they've proven that the piece is over one hundred years old and they've not had any problem.** |
| **Agent:** | **(Nods.). Okay.** |
| **Martinez:** | **The problem is with new ivory, Chinese things, and the like. That is the real problem because they are things made of new things.** |

*Compare* GX 601A at 8-9 *with* Unredacted Transcript at 8-9 (GEUM_00132861 – 2862) (for full exchange) (App.174-21).

---

[1]     U.S. Fish & Wildlife Service Special Agent Victor Penaloza.

**ADDENDUM 4**

Key Redacted Statement Two:

| | |
|---|---|
| Agent: | So, you understand everything about CITES, you know. |
| Martinez: | I do, I do. |
| **Agent:** | **…that you must declare.** |
| **Martinez:** | **I also understand that [] I had… now when I am at this situation, I can prove it is one hundred years old and I'm not going to have any problem.  Because with the help of experts, I can prove it is an antique with one hundred per cent certainty, and I'm not going to have problems because it is no[t] new.** |

*Compare* GX 601A at 10 *with* Unredacted Transcript at 10 (App. DE:29 and DE:174-

21) (for full exchange).

Key Redacted Statement Three:

| | |
|---|---|
| **Agent:** | **And, are there other, you know, other people here in South Florida selling things, like ivory and bronze pieces?** |
| **Martinez:** | **There are many… there are many dealers who sell this.  In Florida, it's not unlawful to sell this.** |
| **Agent:** | **No, no, of course.** |
| **Martinez:** | **No, no.** |
| **Agent:** | **I'm not saying…** |
| **Martinez:** | **In New York it is illegal.  In New York and California.** |
| **Agent:** | **Yes. You're very knowledgeable.  You know a lot about your…** |
| **Martinez:** | **Yes, but new things made of ivory.  Because, again, they are antiques.  That's the law, I read it.  Pieces that are over one hundred years old can be traded.** |
| **Agent:** | **Even for selling in New York.** |
| **Martinez:** | **So, if you live in New York, you can come here to Miami, buy it and take it to New York with you and have it for yourself.  What you can't do in New York is selling it, trading it.** |
| **Agent:** | **Having it for yourself.** |
| **Martinez:** | **Yes.** |
| **Agent:** | **But that's the point.  You're in the business.** |

2

**ADDENDUM 4**

| | |
|---|---|
| Martinez: | You don't understand. |
| Agent: | You understand the law very well. |
| Martinez: | I know because I found… |
| Agent: | No, that's the law, that's the law. |
| Martinez: | It's written. I didn't make this up. |
| Agent: | No, I can read very well, but as I'm telling you, it doesn't matter. |
| Martinez: | That piece never… believe me… I'm going to find experts who can say those pieces are over one hundred years old and so I can have them with me on the plane or bring them in without any problem. |

*Compare* GX 601A at 17 *with* Unredacted Transcript (App. DE:29 and DE:174-21)

at 17 (GEUM_00132870).

Key Redacted Statement Four:

| | |
|---|---|
| Martinez: | I don't know. Whatever you want, but really, I'm going to prove it's an antique and nothing's going to happen to me. |

*Compare* GX 601A at 18 *with* Unredacted Transcript (App. DE:29 and DE:174-21)

at 18 (GEUM_00132871).

Key Redacted Statement Five:

| | |
|---|---|
| Agent: | And the thing is that it won't matter because you have knowledge of the CITES, and you're trading abroad… |
| Martinez: | It doesn't matt… I can make it retroactive in a second. |
| Agent: | No, Martinez, Mr. Martinez, Mr. Martinez. I'm helping you. |
| Martinez: | I'm telling you. |
| Agent: | If you're bringing a piece made of ivory, do you know why is ivory protected? Let me ask you. |
| Martinez: | But modern. |
| Agent: | Do you know why is ivory protected? |
| Martinez: | But modern. |
| Agent: | Modern ivory. |

**ADDENDUM 4**

| Martinez: | For the protection of elephants.  Not there. |
| Agent: | So, yes. |
| Martinez: | But this was done one hundred and twenty years ago. |
| Agent: | Yes, but this… |
| Martinez: | It's not within the jurisdiction. |

*Compare* GX 601A at 19 *with* Unredacted Transcript (App. DE:29 and DE:174-21)

at 19 (GEUM_00132872).

<u>Key Redacted Statement Six:</u>

| Agent: | The problem is that, as you've said, you have never gotten a CITES. |
| Martinez: | No, because I sell it locally. |
| Agent: | Okay, but that's the problem.  You've never… I don't know.  You know a lot about CITES, but I don't think… I'm not sure if you understand it very well or what. |
| Martinez: | No, the clients… the clients… no, I understand that. |
| Agent: | (Nods.) |
| Martinez: | The clients buy the pieces and have them for their apartments here and when they're going to export them, they take their permits and take them abroad legally. |
| Agent: | (Nods.) |
| Martinez: | That's the way it works.  A hundred per cent. |
| Agent: | I don't have to tell you anything. |
| Martinez: | If you want, read the law, read the articles and I'm going to prove these pieces are antique.  And I'm going to get a CITES and… |

*Compare* GX 601A at 19-20 *with* Unredacted Transcript (App. DE:29 and DE:174-21) at 19-20 (GEUM_00132872–2873).

**ADDENDUM 4**